## CONTINENTAL WALL PAPER CO. v. LEWIS VOIGHT & SONS CO.

(Circuit Court of Appeals, Sixth Circuit. January 5, 1906.)

No. 1,509.

1. MONOPOLIES—CONTRACT—RESTRAINT OF TRADE—REASONABLENESS.

Where a combination of manufacturers and wholesalers of wall paper was claimed to be in restraint of trade and in violation of the congressional anti-trust act of 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), it was immaterial to the invalidity of the combination that the agreement was valid at common law as imposing only a reasonable restraint on competition, provided the direct result of its operation was to directly restrain freedom of commerce between the states or with foreign nations.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, § 10.

Monopolistic contracts—validity as affected by public policy, see note to Chicago, M. & St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co., 9 C. C. A. 666; Cravens v. Carter-Crume Co., 34 C. C. A. 486.]

2. SAME—CONTRACT—RESTRAINT OF TRADE—VALIDITY.

Plaintiff corporation was formed to control the output of 98 per cent. of the wall paper mills of the United States, and to this end made contracts with them to buy their entire output at an agreed price. Plaintiff was nominally to make all sales to wholesalers and others, either directly or indirectly, at a uniform price, subject to an agreed scale of discounts, varying according to an arbitrary classification of buyers. The difference between the price at which the manufacturers sold to plaintiff and the price exacted from the buyers from plaintiff constituted the dividends to be distributed to plaintiff's shareholders, who were composed exclusively of those controlling the combining manufacturers; the stock being distributed in proportion to the size of the manufacturer's product the year before plaintiff was formed. The contract provided against the enlargement of the manufacturers' plants, and the only two manufacturers of wall paper machinery in the United States were induced to become parties by agreeing not to sell except to members of the combination. An agreement was also made with Canadian manufacturers to prevent cutting the price. Each member was required to deposit his shares with plaintiff, to be held as security to prevent a breach of the contract. Contracts were then made with jobbers and wholesalers, binding them to buy their entire requirements of plaintiff at specified prices, and not to sell at less than the prices fixed by plaintiff, on pain that if they did not enter into such contracts they could not buy at all. *Held*, that such transaction constituted an illegal combination in restraint of trade and interstate commerce, in violation of Congressional Anti-Trust Act 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

3. SAME—ILLEGALITY OF CONTRACT—SALES—ACTION FOR PRICE.

Plaintiff corporation formed an illegal combination of manufacturers and wholesalers of wall paper in the United States, which constituted a restraint on interstate commerce, and a violation of Congressional Anti-Trust Act 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). Under the contract between plaintiff and the manufacturers, plaintiff was the nominal seller of all the wall paper manufactured by the combination, though it was actually purchased from various jobbers or mills within the combination. Defendants, wholesalers of wall paper, having been compelled to enter the combination and agree to purchase and sell wall paper in accordance with the monopolistic terms of the contract, purchased paper from various members of the combine, for which plaintiff brought suit. *Held* that, since plaintiff was bound to rely on the combination contract to show its capacity to sue, the illegality thereof constituted a defense to the action.

In Error to the Circuit Court of the United States for the Southern District of Ohio.

This is an action to recover a balance of $57,762.10, due on account for wall paper sold and delivered to defendants. The case turned upon the sufficiency of the third defense submitted by the answer to the petition of the plaintiff. To this defense the plaintiff demurred. This demurrer was overruled. The plaintiff declined to plead further, whereupon judgment was rendered for the defendants, dismissing the petition, and taxing the plaintiff with costs. The defense so held to be sufficient was in substance: First. That the plaintiff is a member of an illegal combination among the manufacturers of wall paper, formed for the purpose of enhancing prices, stifling competition, and restraining freedom of commerce between the states and with foreign nations, being such a combination or trust as is forbidden by the anti-trust act of 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) and by the laws of Ohio. Second. That the defendants were compelled to become parties to the illegal combination, and that the contract upon which this suit depends for price and terms of sale constitutes one of the agreements which go to make up the illegal combination represented by the Continental

Wall Paper Company. The answer, embodying the defense here involved, in substance avers: That the National Paper Company, a corporation owning or controlling a large number of wall paper factories situated within the states of New York, Pennsylvania, New Jersey, and Massachusetts, together with a large number of independent firms and corporations engaged in the same manufacture, combined or conspired together for the purpose of controlling the wall paper production in this country by suppressing competition among themselves, and enhancing the price of that article to jobbers, wholesalers, retailers, and consumers. That for this purpose and this end, and to better cover this scheme, they caused the organization under the laws of New York of a corporation known as the Continental Wall Paper Company, with a capital stock of $200,000, divided into 16,000 shares, the shares to be divided among the conspiring firms and corporations in proportion to the production of each factory during the year preceding July, 1898. That the scheme and agreement was that the National Wall Paper Company, as representative of a large number of corporations dominated by it, should select three directors, the other firms and corporations three more, and that the six directors so selected should select a seventh, and the seven directors should direct the combination through the corporate name of the Continental Wall Paper Company. That the plan was that each of the combining concerns should enter into a contract, styling themselves "vendors," with the said company. These contracts to be signed by the several corporations and firms entering into this combination were identical in terms, and were in the following words and figures:

"Exhibit 1.

"This agreement, made this ———— day of ————, in the year one thousand eight hundred and ninety-eight, by and between ————, a corporation organized under the laws of the state of ———————— (hereinafter called the 'Vendor') party of the first part, and the Continental Wall Paper Company, a corporation organized under the laws of the state of New York (hereinafter called the 'Company'), party of the second part: Whereas, the vendor is engaged in the manufacture and sale of wall paper, borders, and other articles usually produced and handled in connection therewith, and the company is desirous of acting as its selling agent in handling the entire product of the vendor; and whereas, the company has an authorized capital of two hundred thousand dollars, divided into 16,000 shares, of the par value of $12.50 each; and whereas, the dealer is desirous of acquiring ———— shares of the stock of said company at par, and to that end has offered to enter into this agreement and to secure the performance thereof by the deposit of said shares: Now, therefore, in consideration of the foregoing recitals, and for other good and valuable consideration, it is agreed, between the parties hereto as follows:

"First. The vendor hereby sells unto the company, and the latter agrees to purchase, the entire product of wall paper that may be manufactured by the vendor for the period from July 20, 1898, to the first day of July, 1899. The prices at which the merchandise shall be sold to the company are set forth in a schedule hereto annexed marked 'A,' and hereby made a part of this agreement. The vendor further grants unto the company the right to two renewals of said contract of one year each, provided that, in the event of the election of the company to avail itself of either of said renewals, it shall so signify in writing to the vendor before the first day of June next preceding the renewal term, and provided further, that such election to renew shall be accompanied by the written consents of all the registered stockholders of the company, including that of the vendor.

"Second. The goods acquired by the company from the vendor hereunder, which are to be sold to jobbers, shall be sold by the company, and not by the vendor for the account of the company. Such sale shall be made by the company at discounts from road prices fixed in the schedule hereto annexed marked 'B,' which is hereby made part of this agreement. The vendor will deliver such goods upon the direction of the company at the risk and for the account of the latter f. o. b. at the place of manufacture, provided, however, that in all cases in which the goods are manufactured at places other than the cities of New York or Philadelphia, the vendor will equalize the freights with

either of said cities out of the proceeds receivable for such goods. Memorandum invoices shall be supplied to the customer and to the company immediately upon the shipment and delivery of such goods, said invoices specifying quantities and road prices.

"Third. There shall be furnished by the vendor to the company on the 7th, 14th, 21st, and last days of each month (except when those days fall on Sundays, and then on the next succeeding day) a just and true statement of all shipments and deliveries of merchandise included in this contract which the vendor may make for the account of the company, which statement shall contain the names of the purchasers, the character of the goods sold, and the prices at which they were sold, to the end that the company may make the proper charges, and in order to entitle the vendor to be credited with the agreed cost price for such goods. Each of such statements of shipments shall be accompanied by an affidavit of one of the officers of the vendor and of one of its bookkeepers and of one of its shipping clerks, to the effect that the information therein contained is true.

"Fourth. The company shall permit the vendor to sell in its own name, and the latter hereby agrees to sell for the account of the company, such of the goods manufactured by the vendor as are to be disposed of to purchasers not classified as jobbers, which sales shall be made at the cost and expense of the vendor; said vendor hereby guarantying all credits and the collection of all accounts connected with such sales. The prices at which and the terms upon which such goods are to be sold are designated in this agreement as the 'Road prices,' and are contained in a schedule hereto annexed marked 'C,' which is hereby made a part of this agreement. On the 7th, 14th, 21st, and last days of each month (except when those days fall on Sundays, and then on the next succeeding days), the vendor will furnish to the company a statement showing all the shipments made on account of such sales, which statements shall contain the names of the purchasers, the character of the goods, and the prices at which they were sold, and such sales shall be credited to the vendor by the company at the prices fixed in Schedule A, and shall be charged against said vendor at the prices at which they were sold, which shall in no event be less than those designated in Schedule C. The vendor is to receive for its services and expenses connected with such sales and allowances discounts equal to those who are designated in a classification made by the parties hereto as 'second class jobbers,' less the discounts made on sales to purchasers designated in the accompanying schedules as 'quantitive purchasers,' on which the vendor has allowed the quantitive discount, except that where special and exclusive goods are sold there shall be an allowance of 30 per cent. discount to the vendor. The prices of goods as fixed by Schedules A and C may be altered from time to time, but the discounts allowed to jobbers shall not be altered at any time during the term of this agreement.

"Fifth. The vendor will make collection of all accounts for goods sold by it for the account of the company under the provisions of this agreement, except for sales to jobbers (which accounts the company is to collect), and will, on the 10th day of each and every month during the term of this agreement account to the company. Such account shall be accompanied by a payment by the vendor to the company of the difference between the prices at which the goods are agreed to be sold to the company as imbodied in Schedule A, and the prices at which the vendor has agreed to dispose of said goods as contained in Schedule C. The purchases made by the company from the vendor hereunder shall be upon the same credit and terms as those accorded to other dealers, but the company shall have the right to anticipate the due date of all such purchases, and will pay, on the 10th day of each month, to the vendor a sum on account of all shipments of the preceding month equal to not less than 30 per cent. of the road prices of goods shipped to jobbers by the company.

"Sixth. The vendor hereby grants unto the company the right, and it shall be the duty of the latter, through its officers selected for that purpose, to audit the books of account of the vendor as to production, sales, and shipments at such times and in such manner as the company may, from time to time, deem necessary or proper. This provision is of the essence of the agreement, and a failure on the part of the vendor to faithfully perform the same

shall operate as a breach of the contract, entitling the company to abrogate the agreement, and to such damages as it may be able to establish in addition to the absolute transfer and surrender to it of the stock to be pledged as hereinafter provided.

"Seventh. There shall be a committee selected from the company, to be known as the 'Auditing Committee,' which shall be made up from among the directors.    Said committee shall have power to establish such a system of bookkeeping as in its judgment may be advisable.    In order to conform as nearly as may be to the laws of the various states in which the factories of the vendor are located, it is understood that the vendor shall not be at liberty to require from the company the acceptance of the product of more than ten hours per day of any one of said factories.    The product intended to be sold to the company hereunder, and which the latter undertakes to acquire, does not contemplate the enlargement of the manufacturing facilities of the vendor; but nothing herein contained shall be construed as affecting the right of the vendor to substitute new machinery of the same capacity for any now in use which may become useless through wear or through destruction by fire or other casualty.    The power to designate the parties who are to be classed as jobbers, and the discounts to which they are entitled, is expressly reserved by the company, and such designation is to be made through its board of directors; but the vendor shall have the right to select the jobbers through whom the goods manufactured by it are to be distributed, and to designate the amount of its goods such jobbers may buy, subject to such credit limitations as the board of directors may impose.    All orders placed with the vendor by jobbers on behalf of the company must be at once reported to the latter.

"Eighth. The company hereby agrees to sell and the vendor agrees to purchase ―――― shares of the comomn stock of the company, for which stock the vendor agrees to pay the sum of ―――― in cash as soon after the execution and delivery of this agreement as the same may be demanded by the company; but only if and when the entire share capital of the company shall have been fully subscribed at not less than par.    The vendor will, after paying for said shares of stock, indorse the certificates representing the same, and deliver the certificates so indorsed in blank to the company, upon the trust and agreement that the company shall hold said certificates as security for the performance by the vendor of each and all of the covenants and conditions of this agreement; and upon the refusal, neglect, or omission of the vendor, its successors or assigns, to perform this agreement, or any part thereof, the said shares of stock and the certificates represented thereby shall be immediately sold by the company at public or private sale, without notice, upon such terms and at such price as the company or its officers may deem reasonable, and that the proceeds of sale be paid into the treasury of the company as the agreed and liquidated damages to the company for the breach of said agreement.    The parties hereto have fixed upon the said stock and the proceeds thereof as liquidated damages, because of the difficulty in establishing, in a court of law, the actual damage that would be suffered by the company in the event of the refusal, neglect, or omission to perform this agreement, and in order to avoid the difficulty of such proof.

"In witness whereof, the vendor and the company have respectively caused this agreement to be executed by their respective presidents, and their respective corporate seals to be hereto attached, pursuant to resolutions of their respective boards of directors, the day and year first above written."

It would unduly lengthen this statement to fully set out the schedules referred to in the above exhibit, and made a part of the contract between the so-called vendors and the company.    The answer then avers that the prices to be charged the company for the product of each so-called vendor was the estimated cost of production and incidental expense to such manufacturer of carrying out his or its part of the contract.    Schedule A of the contract sets out the "list price" of all qualities of paper, and in a parallel column the sale price to the company.    Schedule B sets out the sale price by the company to the several classes of jobbers which the company binds itself to exact, and the terms of sale.    The gross sale price in this schedule is the list price of Schedule A, with a discount, which depends upon the classification of jobbers

provided for by the seventh clause of the contract. Schedule C sets out the sale price to purchasers "other than jobbers" and terms of sale, these prices being also designated as "road prices." These prices are the "list prices" of Schedules A and B, with no discount. To purchasers described as "other than jobbers" certain discounts are provided, dependent upon quantity. Under clause 7 of the contract, set out above, "the company," acting through its directors, selected in the manner heretofore mentioned, is given authority to classify jobbers, and prescribe the discount to each class; each "vendor" being allowed "to select the jobbers through whom the goods manufactured by it are to be distributed, and to designate the amount of its goods such jobbers may buy."

"The distribution of profit over cost to the company may be illustrated by taking two classes of wall paper, one a cheap kind and the other more expensive. Thus the list price of wall paper styled "Brown" is 4 cents per bolt; the sale price to the company 2 cents. The price by the company to "jobbers" in the first class is 4 cents, with a discount of 20 per cent., to "jobbers" in the second class, 4 cents, with a discount of 17½ per cent., to "jobbers" in the third class, 4 cents, with a discount of 15 per cent. The selling price to all purchasers other than those classified as jobbers is fixed at 4 cents flat, unless a discount of small proportions is obtained as a result of a purchase bringing the buyer within the terms of those called "quantity purchasers." "Embossed Bronzes" of one class are listed 18 cents per bolt; jobbers being allowed a discount of 45 per cent., 40 per cent., or 30 per cent., according to the class they have been placed in. All the schedules contain a provision for the equalization of freights with certain cities, thus eliminating advantages due to locality. It is further averred in said defense that the companies, corporations, and firms which organized said company, and which subsequently subscribed for stock and signed one of the agreements like that heretofore set forth, constituted 98 per cent. of all the manufacturers of wall paper in this country. It is further stated that, for better carrying out of the said combination, agreements were made by the plaintiff with parties, companies, and corporations within the United States and Canada, "by which each agreed not to compete with the other nor cut prices, the Americans in Canada and the Canadians in the United States." It is also alleged that to further carry out the purpose to prevent competition and enhance prices, that a contract was made between plaintiff and John Waldron & Son and the Kaukauna Machine Company, the only two manufacturers of wall paper machinery in the United States, one having a manufactory in New Brunswick, New Jersey, and the other a maufactory in Kaukauna, Wisconsin, by which said manufacturers agreed, during the existence of the plaintiff, to sell wall paper machinery only to it and said combination, and not to any mills preparing to start. It is then averred that all wholesale dealers in the United States were arbitrarily divided into two classes—jobbers and "road" or "quantity buyers"—and that the jobbers were arbitrarily divided into the three classes heretofore mentioned, and the other wholesalers into "road" or "quantity buyers" and "special buyers," with the purpose that all should then be compelled to sign written agreements obligating themselves to buy their entire stock of merchandise from the plaintiff direct, or through members of the combination, and to this end identical printed agreements were presented to all jobbers and wholesalers throughout the United States and the territories, by which each obligated itself to buy their entire purchases of wall paper from said plaintiff at list prices of Schedule A, heretofore set out, subject to discounts shown by schedule accompanying each such agreement, and binding each such jobber or wholesaler not to sell at prices lower or better than those shown by another schedule accompanying each such agreement. A copy of the agreement, so required to be signed by each jobber and wholesaler, is made a part of the answer as "Exhibit 2." Same is here set out below.

"Exhibit 2.

"An agreement made this ——— day of ———, in the year one thousand eight hundred and ninety-eight, between the Continental Wall Paper Company, a corporation organized under the laws of the state of New York (hereinafter called the 'Company'), party of the first part and ——— of ——— (here-

inafter called the 'Jobber') party of the second part. In consideration of the sum of one dollar, paid by the jobber unto the company for the granting of this agreement, the receipt whereof is hereby acknowledged, and other valuable considerations, it is agreed, between the parties hereto as follows: First. That the company will sell, subject to such credit limitations as it may impose, and the jobber will purchase, the entire requirements of the jobber in his business of selling wall paper for the business year ending July 1, 1899, to the amount of a gross value, without discounts, of ———, the jobber reserving to himself the right to purchase such merchandise as he may need in excess of ——— from others. The company is to deliver the goods without additional charge f. o. b. at New York or Philadelphia, or to equalize freights from the places at which it makes deliveries to either of said cities. Second. The jobber shall be allowed discounts at the rates shown in the accompanying schedule marked 'A,' which is hereby imbodied in this agreement as a part thereof. The terms of payment to be as follows: Four months from the date of invoice, with discount at the rate of 1 per cent. per month for anticipated payment; provided settlement be made within 30 days from date of shipment either by cash or note. Invoices for all goods shipped between October 15th and March 1st to take the latter date. Third. Attached hereto marked 'B' is a schedule of the road prices at which the company sells its goods for the term embraced in this contract to dealers other than jobbers, and also a statement of discounts allowed to such customers other than jobbers for quantity purchasers, together with the terms of credit and freight allowance to which such customers are entitled. It is an essential condition of this agreement that the jobber will not directly or indirectly sell or offer for sale any of the merchandise purchased from the company hereunder at lower prices or upon better or more favorable terms than those shown in Schedule B; the intent hereof being to assure the company against the use by the jobbers of this agreement to undersell the company. The prompt performance by the jobber of the provisions of this agreement as to payment and otherwise is a condition precedent to exacting the continuous performance of said agreement by the company.

"In witness whereof the company has caused this instrument to be executed, and the jobber has hereunto set his hand the day and year first above written.

"———.
"———.''

Schedule A of the above agreement is identical with Schedule B of the agreement between "vendors and the company," heretofore set out, and Schedule B, attached to and made a part of Exhibit 2, above set out in full, is same as Schedule C attached to Exhibit 1, heretofore set out.

It is charged that "the immediate, intended, and direct effect of said combination and agreements was the stifling of competition between said manufacturers and vendors of wall paper and between jobbers and wholesalers thereof, and to unduly enhance the price of wall paper, making it one-half more than the price which it would be if same had been left to free and unrestricted competition." It is further distinctly averred that by these agreements and contracts aforesaid the entire wall paper trade throughout the United States passed into the hands of the plaintiff company, and that it "threatened defendant that, unless it signed said agreement (Exhibit 2, set out above), no wall paper would be sold to it. That said combination would make it impossible for it to buy wall paper or to continue its business, and would drive it out of its said business, and compel it to sacrifice the good will owned by it, as aforesaid, and the capital invested by it in said business." It is further averred that the defendant conducted for many years a large business in wall paper at Cincinnati, selling to retailers and consumers in Ohio and other states of the Union. That the defendant, finding it impossible to continue business without signing said agreement shown in Exhibit 2, did sign and become a member of said combination. The defendant charges that, under the contract so signed by him, he purchased more than $200,000 worth of wall paper, and that the prices he was compelled to pay were extortionate and unreasonable, and more than 50 per cent. greater than they would

have been had competition between wall paper makers not been completely suppressed by the agreements between such manufacturers and said corporation.

Lewis Marshall, for plaintiff in error.
Orris P. Cobb and Morrison R. Waite, for defendant in error.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

It has been urged that the defense to the claim in suit must fail upon either, of two grounds: First, that the contract between the plaintiff corporation and the manufacturers of wall paper does not contain any stipulations beyond those admissible and essential to protect the contracting parties in securing reasonable prices and against unreasonable and demoralizing competition; second, that if it be conceded that the agreement does constitute an unlawful combination in restraint of interstate trade and commerce, that that fact affords no defense to a suit for the price of goods sold and delivered to the defendant. These in their order.

As to the first point, it need only be said that the legality of the contract between the combining companies at common law, as imposing only a reasonable restraint upon the freedom of competition, is not a defense if the dominant purpose of the agreement and the direct result of its operation is to directly, and not incidentally, restrain freedom of commerce between the states or with foreign nations. Until the Supreme Court shall otherwise hold, we feel concluded by the meaning placed upon the act by United States v. Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Chesapeake & O. Fuel Company v. United States, 115 Fed. 610, 53 C. C. A. 256; and not departed from in Northern Securities Company v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679. But we think the combination and agreement shown by Exhibit 1 comes within the prohibition of the act of Congress, whether that act be aimed only at unreasonable restraints or not. That contract and agreement is one between 98 per cent. of all the wall paper makers in the United States, who co-operate through a corporation organized by them for the single purpose of selling their gross product. That there shall be no competition between the combined companies is insured by the agreement that each manufacturer shall sell his entire product at an agreed price to the plaintiff corporation, which is to nominally make all sales, either directly or indirectly, at a uniform price, subject to an agreed scale of discounts, varying only according to an arbitrary classification of buyers. The difference between the price at which the so-called "vendors" sell to the plaintiff company and the price exacted from those who buy from it will be profit, and the profits will constitute the dividends to be distributed to plaintiff's shareholders, and plaintiff's shareholders are exclusively composed of the combining companies, called "vendors"; its comparatively insig-

nificant amount of stock being placed with these vendors in proportion to the product of the year before the combine took effect. To prevent the enlargement of the product of any one of the vendors, it is provided, in effect, that there shall be no enlargement of plant, though new machinery may be used to replace old or that destroyed.

To insure a monopoly of the business to themselves, and keep strangers out of it, it is alleged, and not denied, that the only two manufacturers of wall paper machinery in the United States became parties to the combination by agreeing to sell no machinery to strangers, and to confine their sales to the combine. To add to the protective force of the tariff duties tending to keep out foreign products, it is also averred that an agreement was made with Canadian paper makers to protect each other against any cutting of prices. To insure against any kicking out of the agreement or violations in any way, each member is required to indorse its shares in the Continental Wall Paper Company to that corporation, which is to hold and apply the same as liquidated damages in case of any breach. But that there should be no inducement to fly the contract, the scheme contemplated that every wholesale buyer should engage himself to buy his entire supply from the combine; and to secure the engagement of each such jobber or wholesaler to the scheme, no paper was to be sold to such as did not sign. This made the contract practically unbreakable, for if a factory should weary of the monopoly, it could find no jobbers or wholesalers free to buy its product, and it would be driven to rely upon such orders as it could get from retailers or consumers. That this union of former competitors—a union embracing substantially all of the wall paper mills in the land (for the 2 per cent. left out may be ignored as an active competition), should result in an unreasonable enhancement of prices is precisely what we might anticipate. Wall paper is a product of universal necessity, and the consumers are found in every household. Every principle of economic law instructs us that under such conditions there will be an enhancement of price, limited only by the unknown boundary of human greed and corporate avarice. It is therefore not to be doubted that the averment confessed by the pleading, that prices have been advanced 50 per cent., is substantially true. The conspiring mills were situated in many states. The consumers embraced the whole citizenship of the United States. The jobbers and wholesalers who were to be coerced into contracts to buy their entire demands from the Continental Wall Paper Company, or be driven out of business, were in every state.

Before the combination, each of the combining companies was engaged in both state and interstate commerce. The freedom of each, with respect to prices and terms, was restrained by the agreement and interstate commerce directly affected thereby, as well as by the enhancement of prices which resulted. A more complete monopoly in an article of universal use has probably never been brought about. It may be that the wit of man may yet devise a more complete scheme to accomplish the stifling of competition; but none of the shifts resorted to for suppressing freedom of commerce and securing undue prices, shown by the reported cases, is half so complete in its details. None of the schemes with which this may be compared is more cer-

tain in results, more widespread in its operation, and more evil in its purposes. It must fall within the definition of a "restraint of trade," whether we confine ourselves to the common-law interpretation of that term, or apply that given to the term as used in the federal act by the cases we have cited above.

This brings us to the vital question in the case, which is the bearing of the fact that the plaintiff is but the corporate hand of an illegal combination under the anti-trust law of 1890 upon the liability of the defendants in this action for the price of wall paper bought from the illegal combine. The contention is that the contract upon which the action is brought is wholly collateral to any contract between the plaintiff and the other members of the illegal combination. But if the contract to pay for the goods included in the account sued upon is only part of an entire agreement, which includes stipulations which are illegal, the case of the plaintiff must fail. It is elementary law that the courts will not lend assistance in any way in carrying out an illegal agreement. McMullen v. Hoffman, 174 U. S. 639, 654, 19 Sup. Ct. 839, 43 L. Ed. 1117; Embrey v. Jemison, 131 U. S. 336, 348, 9 Sup. Ct. 776, 33 L. Ed. 172. Nor can a plaintiff show only such part of an entire agreement as is legal, and sue upon that alone. The whole must come. See cases just cited. If the combination had stopped with the agreement between the manufacturers and the plaintiff, by which the competition between the makers of wall paper had been obviated and a uniform sale price settled, this fact would have been no defense for the price of goods sold by the illegal combination to a stranger. If the defendants had been injured in their business by such an illegal method of enhancing prices, their only remedy would have been a direct action for damages, under section 7 of the anti-trust act (26 Stat. 210 [U. S. Comp. St. 1901, p. 3202]). Montague & Co. v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608; City of Atlanta v. Chattanooga Foundry & Pipe Works Co., 127 Fed. 23, 61 C. C. A. 387; and Connolly v. Union Sewer Pipe Company, 184 U. S. 540, 551, 552, 22 Sup. Ct. 431, 46 L. Ed. 679. If the illegal agreement in restraint of trade had included only a contract between the manufacturers themselves, the defendants and all other jobbers would at least have had the privilege of buying from whom they could best get that which they wanted, and the liberty of selling to whomsoever and at such prices as they saw fit. Competition between themselves in buying and selling would be free except in so far as the market was monopolized by the combine between manufacturers. But this might have resulted in conditions threatening to the permanency of the manufacturers' monopoly by offering a strong inducement for strangers to enter the field with new plants, and to those within the fold to break away. These considerations doubtless led to such an extension of the agreement or combination, as to take in the jobbers and wholesalers. This was easy to do, for the threat to refuse to sell to such as would not come in would inevitably bring them to an agreement. And so the defense avers that the plan and agreement of the manufacturers, who organized the plaintiff as an instrumentality through which competition between themselves might be stifled, included the bringing into the combination all the

jobbers and wholesalers in the United States by identical agreements with each such dealer and the plaintiff, whereby the contracting jobbers should agree to buy exclusively from the plaintiff or other members of the combine, and to sell only according to a schedule of prices and terms of credit dictated by the plaintiff. It is also averred and admitted by the demurrer that this purpose was carried out, and identical agreements obtained with all jobbers and wholesalers. The form of all such contracts with jobbers has been set out as Exhibit 2 in the statement of this case. Under threat that they must sign this jobbers' agreement or be driven out of business, the defendants signed, and this is an action for goods sold upon the terms and prices settled by that contract. That contract provides, among other things, that the jobbers shall deal only with the plaintiff. The form in which this agreement is stated is to buy his demand up to a certain sum inserted by the plaintiff, and only the excess over that from other sources of supply. But that form of putting the agreement is but a shallow blind. The amount inserted to fill the blank is, as averred, always twice as much, or more, than the gross purchases of the preceding year. This leaves no probability of any demand over the sum inserted. With reference to the jobber's liberty of sale, it is provided:

"Third. Attached hereto marked 'B' is a schedule of the road prices at which the company sells its goods for the term embraced in this contract to dealers other than jobbers, and also a statement of discounts allowed to such customers other than jobbers for quantity purchases, together with the terms of credit and freight allowance to which such customers are entitled. It is an essential condition of this agreement that the jobber will not directly or indirectly sell or offer for sale any of the merchandise purchased from the company hereunder at lower prices or upon better or more favorable terms than those shown in Schedule B; the intent hereof being to assure the company against the use by the jobbers of this agreement to undersell the company. The prompt performance by the jobber of the provisions of this agreement as to payment and otherwise is a condition precedent to exacting the continuous performance of said agreement by the company."

Schedules A and B, referred to in the jobbers' agreement, are Schedules B and C of the manufacturers' agreement. But the essential entirety of agreement between the so-called vendors and the plaintiff and that between the plaintiff and the defendants and all other jobbers, and the necessity the plaintiff is under to found its right of action upon the entire agreement, is illustrated by the company's attitude as plaintiff. It does not make a roll of paper. The mill-owners continued to operate their respective mills, and to take and fill orders after as before the combine. But by Exhibit 1 all sales to "jobbers" were to be in the name and on account of the plaintiff, and the price collected by the plaintiff. As the contract suggestively puts it, *"the vendor shall have the right to select the jobbers through whom the goods manufactured by it are to be distributed, and to designate the amount of its goods such jobbers may buy."* Thus the petition or declaration in this case is upon an account which shows purchases by the defendants from many different members of the combine, and the amount bought from each. But the plaintiff sues for the aggregate balance due upon the several purchases. This action it seeks to maintain, not upon any averment of an assignment

by the several vendors to it, but as upon an account with it and not the vendors. These and other considerations lead us to the conclusion that the several agreements we have referred to constitute one whole, and that the general purpose and design and the undoubted result is to establish an illegal combination of manufacturers and wholesale dealers in restraint of trade—state and interstate.

The jobbers who have signed the particular contract essential to secure their co-operation are, in a sense, victims, for they have been coerced into agreement. Nevertheless, they are also members of the illegal combination, and active participants in the scheme for the illegal enhancement of prices, the stifling of competition, and the restraint of freedom of trade and commerce. The jobbers do not share in the benefits which result to the manufacturers from the stifling of competition between themselves and the enhancement of prices thereby resulting. By that the jobbers are victimized. But the jobbers do share in the benefits growing out of the destruction of competition in prices as between themselves. The enhanced prices which they pay are exacted again from retailers. The consumer, at last, is the only real victim. It is the consumer who makes up the public, which it is the object of the law to protect against undue exactions through illegal combinations in restraint of freedom of commerce and fair play in commercial transactions.

The defense which we sustain here is not for the sake of William Voight & Sons. The averment that they paid 50 per cent. more for their gross purchases in consequence of the illegal combination has little merit in it, moral or otherwise. They doubtless sold again at the great minimum profit they agreed to exact from retailers, and the retailers later exacted the undue profit from the consuming public. There, at last, like all burdens, it must rest. The defense here sustained is good only because it is only possible to protect the public by refusing all assistance in carrying out an illegal agreement.

This is the policy of our law, and to maintain this policy the judgment of the Circuit Court must be affirmed.

NOTE.—Following will be found the opinion of the court below, submitted on demurrer to the second, third, fourth, and fifth defenses of the answer:

"The demurrer cannot be sustained to the second defense. The plaintiff is a corporation duly organized, and the transaction in question was between it and the defendant. If the transaction be lawful, then any cause of action arising out of it against the defendant is vested in the plaintiff, and no one else can sue upon it. If it be unlawful, recovery will be denied, not because the plaintiff is not the real party in interest, but because the policy of the law will not permit a recovery. If there be a right of action at law, it is, upon the defendant's own showing, vested in the plaintiff.

"In the third defense it is shown that the defendant for many years prior to the bringing of this suit was a jobber in buying and selling wall paper in Ohio and other states and territories of the United States; that certain persons, firms, and corporations, 36 in number, engaged in the manufacture of wall paper, their product being upwards of 98 per cent. of all the wall paper manufactured and sold in the United States, conspiring to form a combination by which to limit the production of wall paper in the United States, and to enhance the prices thereof to jobbers, wholesalers, retailers, and consumers, and to restrain trade and commerce between the several states and territories of the United States and with foreign nations, 'agreed with each

other that, while said corporations and persons should retain ownership of their said plants and business, and preserve and continue their several identities, and operate said manufactories and businesses as before, the control of said businesses, and, all matter relating to and affecting the production of said establishments and the price and sale of all wall paper manufactured thereby, should be under the control of a committee to be appointed by said several corporations and firms, each to have a voice in such appointment in proportion to the capacity of the several factories owned by them, respectively; that such committee should adopt rules and regulations governing the manner of conducting the business of said firms and corporations, the hours said factories owned by them should be operated, the patterns of wall paper to be manufactured by them, the times when samples of the goods to be manufactured for the ensuing season should be submitted to a pricing committee appointed by said committee, to enable it to classify and fix the list prices thereof, to fix and determine list prices, discounts, terms of sale, equalization of freight rates, and all other matters affecting the production and regulation of prices, and the classification of the dealers in wall paper in the United States, and the prices at which wall paper should be sold to and by such several classes, and the division of the profits arising among said corporations and firms, not in proportion to their production and sales, but in proportion to their capacity; and, further, that, to secure the faithful performance by each of said persons and corporations of the provisions of said trust agreement, they should each pay a sum into a common pool, in proportion to the capacity of their respective manufactories, which said sum should be forfeited by any of said manufacturers who should break said agreement, compete with the other parties to said agreement, or sell at other or different prices than those to be fixed by said committee.' And to defeat and evade the law it was further agreed that: 'For the more effectual carrying out of said scheme, a corporation should be ostensibly formed under the laws of the state of New York, to be called the "Continental Wall Paper Company," being the plaintiff herein, with a capital stock of $200,000, to be divided into 16,000 shares of the par value of $12.50 each, said stock to be divided among said corporations and firms in proportion to the number of rolls of paper manufactured by them in the year preceding said month of July, A. D. 1898.' That seven directors of said Continental Wall Paper Company should be selected by the members of the combination. That said corporations and firms each and the Continental Wall Paper Company should sign a printed contract, a copy of which is attached to the answer as Exhibit 1, in which the manufacturer is designated as the vendor and the plaintiff as the company, and which provides, among other things, in substance, that the company shall act as selling agent in handling the entire product of the vendor at the prices set forth in Schedules A, B, and C of Exhibit 1. That there shall be no enlargement of the manufacturing facilities of the vendor, but that new machinery may be substituted for old which may become useless. It also provides for the classification of the purchasers of wall paper. And it was further agreed that the Continental Wall Paper Company should require all dealers in wall paper, whether jobbers or wholesalers, to sign an agreement, a copy of which is attached to the answer as Exhibit 2, which, among other things, provides: 'First. That the company will sell, subject to such limitations as it may impose, and the jobber will purchase, the entire requirements of the jobber in his business of selling wall paper for the business year ending July 1, 1899, to the amount of a gross valuation, without discounts, of ———, the jobber reserving to himself the right to purchase such merchandise as he may need in excess of ——— from others. * * * Second. The jobber shall be allowed discounts at the rate shown in the accompanying schedule, marked "A," which is hereby imbodied in this agreement as a part thereof. Third. Attached hereto marked "B" is a schedule of the road prices at which the company sells its goods for the term embraced in this contract to dealers other than jobbers, and also a statement of discounts allowed to such customers other than jobbers for quantity purchases, together with the terms of credit and freight allowance to which such customers are entitled. It is an essential

condition of this agreement that the jobber will not, directly or indirectly, sell or offer for sale any of the merchandise purchased from the company hereunder at lower prices or upon better or more favorable terms than those shown in Schedule B the intent hereof being to assure the company against the use by the jobber of this agreement to undersell the company.' And in the event of the refusal of any wholesaler to sign such agreement, no paper should be sold to him, and he should be driven out of business. It is further shown that 'to conceal the fact that it (Exhibit No. 2) was an agreement to purchase from no one but said company and the members of said combination and trust, the amount of purchases made by the buyer in the previous year from all the members of said combination and trust, being the entire amount of purchases made by such buyer during the preceding year, was ascertained, and an amount at least double thereof, being an amount supposed to be, and which was in fact, more than, by any possibility, could be needed by such buyer, was inserted in said blanks as the amount to be purchased by such buyer from the company.' And it is further shown that 'at the time of the formation of said combination and trust John Waldron & Son and the Kaukauna Machine Company were the only manufacturers in the United States of wall paper manufacturing machinery in the United States, having their factories, one in New Brunswick, N. J., and the other in Kaukauna, Wis., and were engaged in manufacturing wall paper machinery in said states. * * * In further carrying out of said combination and trust, * * * agreements were made between said manufacturers of machinery and said plaintiff, by which, for a certain consideration, said manufacturers of machinery agreed, during the existence of plaintiff, to sell wall paper manufacturing machinery only to it and the members of said combination, and not to any new mills desiring to start.' And it is further shown that 'the members of said combination and trust, the said plaintiff, further to carry out said agreement, compelled all the other wholesale and quantity buyers to sign agreements, in the form attached to this answer, marked "Exhibit 3," the same being a printed form with blanks for signatures, and having attached thereto the prices shown as Schedule C, attached to Exhibit 1, which are the list prices referred to in said agreement.' And it is further shown that the combination had the power and the will to prevent the defendant from obtaining wall paper for its trade, and to drive it out of business, and that, by reason thereof, it was compelled to, and did, sign the agreement attached to the answer as Exhibit 2, and in carrying out said scheme and combination did purchase from the plaintiff, and the plaintiff did deliver to the defendant, 'in the year from September, 1898, to September, 1899, wall paper, for which this defendant paid to said plaintiff for and per direction of the members of said combination the sum of $144,854.14,' as shown by the statement of account attached to the petition. That the prices charged in the exhibit attached to the amended petition are the prices fixed and determined in pursuance of and by the combination or trust agreement, and at least one-half more than they would otherwise have been, and that the wall paper was purchased by the defendant and delivered by the plaintiff in pursuance of said combination or trust agreement, and that this suit is an attempt to enforce and recover the prices so fixed by said combination.

"In short, this defense shows a combination of manufacturers of wall paper, of manufacturers of wall paper machinery, and of jobbers and wholesalers of wall paper, with power to control the production and sale of all wall paper machinery and 98 per cent. of all wall paper manufactured in the United States, and that in the exercise of this power it limited production, prevented competition, fixed and enhanced the prices of wall paper, and compelled the jobbers and wholesalers throughout the United States to buy and sell to retailers and consumers at the prices so fixed, and that this action is founded on an account for wall paper sold to the defendant as one of the members of the combination, by the plaintiff as the agent and trustee of the combination, at the prices so fixed by the combination, and in furtherance of the purposes of its organization. Assuming, for the purpose of the demurrer, that the allegations of this defense are true, it follows that the combination was illegal and unlawful, within the meaning of the anti-trust laws of Ohio and

of the United States. The present case differs from the Connolly Case, 184 U. S. 540-549, 22 Sup. Ct. 431, 46 L. Ed. 679, in this: that the purchases by the defendant had direct and necessary connection with the illegal combination. The defendant was not an outsider, purchasing goods of the plaintiff in the usual and ordinary course of buisness, but a member of the combination, who purchased the goods from the combination through its representative and agent, upon the terms prescribed by the combination, and in furtherance of its purposes. The demurrer to this defense, therefore, is not well taken, and will be overruled.

"Under the fourth and fifth defenses, the defendant seeks to recover by way of cross-petition under the anti-trust laws of Ohio and of the United States, as damages, double and treble the moneys paid by it to the plaintiff for wall paper, as shown by the exhibits attached to the petition and the amendment thereto. The demurrer to these defenses is well taken, and will be sustained. It is not admitted in these defenses that the defendant was a party to the illegal combination, but the defendant is bound by the admission of the third defense. It will not be permitted to admit for the purposes of the third defense, and deny for the purpose of the fourth and fifth defenses, a fact pertinent to the transaction under investigation."