## UNITED STATES v. INTERNATIONAL HARVESTER CO. et al.

### (District Court, D. Minnesota. August 12, 1914.)

1. MONOPOLIES (§ 12*)—ANTI-TRUST ACT—CONSTRUCTION—COMBINATION IN RESTRAINT OF TRADE.

    A combination may be one in restraint of interstate trade and commerce, or to monopolize a part of such trade and commerce, in violation of Sherman Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), although such restraint or monopoly may not have been attempted to any harmful extent, but is potential only.

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

2. MONOPOLIES (§ 12*)—RESTRAINT OF TRADE—COMBINATION.

    The elimination of competition between competing concerns, if illegal, is equally so, whether effected by an agreement or by a consolidation.

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

3. MONOPOLIES (§ 12*)—COMBINATIONS IN "RESTRAINT OF TRADE."

    Suppression of competition by means of a combination, where the parties to it control a large portion of the interstate or foreign commerce in the article, and where there is no obligation to form the combination arising out of the fact that they are losing money or the like, is an undue "restraint of trade."

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

    For other definitions, see Words and Phrases, vol. 7, pp. 6185, 6186.]

4. MONOPOLIES (§ 14*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE.

    Defendant International Harvester Company was a consolidation of five harvester companies, which together produced from 80 to 85 per cent. of all the harvesting machinery sold in the United States. Some or all of them were prosperous, and there had previously been keen competition between them. One of the combining companies, of which defendant owned all the stock, was changed in name and made the sole selling agent for all of the products of the several plants. Defendant was not overcapitalized, and its methods of doing business were in general fair to competitors. It purchased all of the stock of another large harvester company, but permitted it to continue to do business and to advertise as an independent and competing concern. Held, that defendant was organized to eliminate competition between the combining companies, and was from the beginning a combination in restraint of interstate commerce, and to monopolize such commerce in harvesting machinery, and illegal, as in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 11; Dec. Dig. § 14.*]

    Sanborn, Circuit Judge, dissenting.

In Equity. Suit by the United States against the International Harvester Company and others. On final hearing. Decree for complainant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

. The Attorney General and Edwin P. Grosvenor, Sp. Asst. Atty. Gen., for the United States.

John P. Wilson, of Chicago, Ill., Wm. D. McHugh, of Omaha, Neb., and Edgar A. Bancroft, of Chicago, Ill. (Philip S. Post and Victor A. Remy, of Chicago, Ill., of counsel), for defendants.

Before SANBORN, HOOK, and SMITH, Circuit Judges.

SMITH, Circuit Judge. The petition in this case was filed April 30, 1912, under section 4 of "An act to protect trade and commerce against unlawful restraints and monopolies," generally known as the "Sherman Law." Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

Under that section the Circuit Court was vested with jurisdiction of such suits, but the Circuit Court was abolished by Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1167 [U. S. Comp. St. Supp. 1911, p. 243]) § 289, and by section 291 the jurisdiction under section 4 of the Sherman Law passed to the District Court. The Attorney General having, under Act Feb. 11, 1903, c. 544, 32 Stat. 823 (U. S. Comp. St. Supp. 1911, p. 1383), filed with the clerk of the District Court a certificate that this case is of general public importance the same came on for hearing before the Circuit Judges named, notwithstanding the abolishment of the Circuit Court. Ex parte United States, 226 U. S. 420, 33 Sup. Ct. 170, 57 L. Ed. 281.

The petition makes defendants the International Harvester Company, the International Harvester Company of America, the International Flax Twine Company, the Wisconsin Steel Company, the Wisconsin Lumber Company, the Illinois Northern Railway Company, the Chicago, West Pullman & Southern Railroad Company, Cyrus H. McCormick, Charles Deering, James Deering, John J. Glessner, William H. Jones, Harold F. McCormick, Richard F. Howe, Edgar A. Bancroft, George F. Baker, William J. Louderback, Norman B. Ream, Charles Steele, John A. Chapman, Elbert H. Gary, Thomas D. Jones, John P. Wilson, William L. Saunders, and George W. Perkins.

All of these defendants made answer. The case was tried and has been submitted to the court for a decree. As the pleadings are elaborate, covering more than 130 pages of printed matter, and as no questions have been raised as to the sufficiency of any of them, we will state the facts as shown, contenting ourselves with saying that all of the facts found by the court are either expressly covered by the allegations of the pleadings or are within the necessary implications thereof. In their argument defendants' counsel say:

"This case is one of fact, not of controverted questions of law."

It will be necessary, therefore, to review the facts fairly, fully, but not elaborately, as there are 18 volumes and nearly 10,500 printed pages in the record.

. Agricultural implements may be divided into five classes:

(1) Tillage implements, such as plows, harrows, and other instruments used in keeping the soil in good condition.

(2) Seeding implements, such as corn planters, drills, and seeders.

(3) Harvesting implements, such as harvesters, mowers, reapers, rakes, and the like.

(4) Threshing machines.

(5) Implements for general agricultural use, such as wagons, manure spreaders, gas engines, cream separators, tractors, and certain similar tools and instrumentalities.

The defendant the International Harvester Company, hereafter called the International Company, was organized on August 12, 1902, under the laws of New Jersey. The objects for which it was organized, as stated in the articles of incorporation, were:

"To manufacture, sell, and deal in harvesting machines, tools, and implements of all kinds, including harvesters, binders, reapers, mowers, rakes, headers, shedders, machinery, engines, wagons, motor vehicles, and vehicles of all kinds; agricultural machinery, tools, and implements of all kinds, binder twine, and all devices, materials, and articles used or intended for use in connection therewith, and all repair parts and other devices, materials, and articles used, or intended for use, in connection with any kind of harvesting or agricultural machines, tools, or implements, or any gasoline, electric, or other vehicles.

"To engage in the manufacture or production of, and to deal in, any materials or products which may be used in, or in connection with, the manufacture of harvesting or agricultural machines, tools, and implements."

Prior to that time the principal manufacturers of harvesting implements in the United States had been:

First. The McCormick Harvesting Machine Company, a corporation, of Chicago, Ill., founded about 1849;

Second. D. M. Osborne & Co., a New York corporation, with a plant or plants at Auburn, N. Y., founded about 1860;

Third. The Warder, Bushnell & Glessner Company, an Ohio corporation, with its manufacturing plant at Springfield, Ohio, and its offices at Chicago, Ill., which manufactured under the name of the Champion, founded about 1869;

Fourth. The Deering Harvester Company, a copartnership, of Chicago, Ill., founded about 1875;

Fifth. The Milwaukee Harvester Company, of Milwaukee, Wis.; and

Sixth. The Plano Manufacturing Company, of West Pullman, Ill.

While these were the leading manufacturers of harvesting machines, they had other, but not general, lines of manufacture of agricultural implements.

On June 24, 1902, P. D. Middlekauff secured, in his own name, an option on the stock and plant of the Milwaukee Harvester Company, for $3,123,691.90. He did this in fact as agent, though it does not clearly and certainly appear who his principal was, whether J. P. Morgan & Co., George W. Perkins, or the McCormick Harvesting Machine Company. He did it, however, at the direct instance of the McCormick Harvesting Machine Company, but whether it was acting as principal or agent is left in some slight doubt.

On June 25, 1902, Mr. Middlekauff went to New York with a letter from an officer of the McCormick Company, authorizing him to assign this option to J. P. Morgan & Co., of which George W. Perkins was a

member, or to any one they might designate, and reciting that the option had been obtained "for us." Mr. Middlekauff remained in New York until July 30, 1902, aside from being absent a small portion of the time in Philadelphia and Washington on business for Mr. Perkins.

On August 11, 1902, a new contract was made for the purchase of the Milwaukee Harvester plant by Mr. Middlekauff, and on the same day he assigned his contract to Mr. William C. Lane, a New York banker and then president of the Standard Trust Company.

In July, 1902, the representatives of the McCormick, the Deering, the Warder, Bushnell & Glessner, and the Plano were all in New York, but stopping at different hotels and not seeing one another. They were all seeing, however, Mr. George W. Perkins. On July 28, 1902, they met and gave separate contracts to William C. Lane, heretofore referred to, and his assigns, to sell all their tangible property and specified portions of their bills receivable. These agreements all contained a recital that the purchaser, upon his acquisition of the property, intended to transfer the same to a corporation to be organized under the laws of Illinois, or some other state, called the "purchasing company." It was in each case, except that of the Warder, Bushnell & Glessner Company, stipulated that the entire purchase price should be paid in fully paid nonassessable stock of the purchasing company.

On August 11, 1902, the companies all signed an agreement for the immediate delivery of their plants and property, without waiting for any appraisement theretofore stipulated for in each instance.

On August 12, 1902, the very day of the organization of the International Harvester Company with a total capital of $120,000,000, Mr. Lane appeared before the board of directors and offered to sell the Milwaukee Harvester Company plant as a going concern, including its bills receivable and the plants of the McCormick Harvesting Machine Company, the Deering Harvester Company, the Plano Manufacturing Company, and the Warder, Bushnell & Glessner Company, and to furnish $60,000,000 of working capital, to be represented by accounts and bills receivable of the McCormick Harvesting Machine Company, the Deering Harvester Company, and the Plano Manufacturing Company, or in cash, for the $120,000,000 of the capital stock of the company, and on August 13, 1902, this proposition was accepted. The property turned in was of greater value than the stock issued for it. This case, therefore, involves no question of overcapitalization.

In pursuance of this agreement there was turned over to the company $40,000,000 of the bills receivable of the McCormick Harvesting Machine Company, the Deering Harvester Company, and the Plano Manufacturing Company, guaranteed by them, respectively. In all Mr. Lane did in this matter he was acting upon the suggestion of his counsel, Messrs. Guthrie, Cravath & Henderson. He was compensated, but there never was any idea upon his part that he owned any of the properties. He was a mere conduit or instrumentality in the transaction.

The International Company shortly acquired all the stock of the Milwaukee Harvester Company, as it had already acquired the plant. It reduced the capital of the Milwaukee Harvester Company to $1,-

000,000, and changed the name to the International Harvester Company of America, hereafter called the America Company. It was for a considerable time officered by the same men who held the offices in the International Company. A contract was entered into between the International Company and the America Company by which the former contracted to sell to the latter its entire output and the latter undertook the responsibilities of reselling the same. The America Company, in addition to buying the manufactured products of the International, bought from outside parties some threshers, wagons, plows, etc., and resold them; but the dealing in all property not the product of the International Company only amounts to about 2½ per cent. of its business. All the stock of the America Company is still the property of the International Company.

The two defendant railroads are switching roads to the factories of the International Company; one acquired in the consolidation mentioned, and one constructed by the new company. The International Flax Twine Company, the Wisconsin Steel Company, and the Wisconsin Lumber Company are auxiliary companies of the International Company, and the personal defendants are officers and directors of the last-named company.

It is alleged in the petition that these five companies produced over 85 per cent. of all harvesting machinery sold in the United States, and it is admitted in the answer that said companies produced approximately 80 to 85 per cent. of the binders, mowers, reapers, and rakes.

In January following the consolidation of the five companies, the International Company acquired the D. M. Osborne & Co. stock, and the companies thus combined manufactured a still greater percentage of the harvesting machinery used in the United States and nearly the whole of that exported from the United States. The five companies except the Milwaukee Company all took stock in the new company, and with the exception of the Warder, Bushnell & Glessner Company took stock for the entire amount of property turned over by them, and this amounted to $93,400,000 of the $120,000,000 capital of the new company. $6,600,000 of the capital of. the new company was paid to J. P. Morgan & Co., of which $3,148,196.66 was for the Milwaukee Harvester Company's property and business, and $3,451,803.34 was for services and expenses in connection with the organization of the International Company. Thus $100,000,000 of the capital of the new company was clearly covered, without any new or additional working capital. By agreement among all the parties who were to receive shares of stock in the International, all the stock except enough to qualify directors was vested in voting trustees, namely, George W. Perkins, Cyrus H. McCormick, president of the McCormick Harvesting Machine Company, and Charles Deering, of the Deering Harvester Company. These voting trustees were maintained for ten years.

The day of the transfer to the International Harvester Company of the five plants, Cyrus H. McCormick, Harold F. McCormick, Stanley McCormick, all of the McCormick Harvesting Machine Company, and Cyrus Bentley, the Chicago attorney of the company, Charles

Deering, William Deering, James Deering, and Richard F. Howe, all of the Deering Harvester Company, John J. Glessner, of the Warder, Bushnell & Glessner Company, and William H. Jones, of the Plano Manufacturing Company, were all chosen directors of the International Harvester Company and constituted the majority of the board.

When the D. M. Osborne & Co. purchase was made, while the International bought all the stock, it permitted the Osborne Company to continue to appear to be independent. It is claimed that this was done to enable the Osborne to collect its bills receivable, which were not acquired by the International. There was commercial advantage in claiming not to be associated with the International. Many persons were opposed to buying from it, and for two years the Osborne Company persistently advertised that it was independent.

While under the old-time law of warranty it might be justifiable for the Osborne Company to conceal its relations with the International, there can be no excuse for the affirmation upon its part that it was independent after it had been acquired by the International.

"The seller may let the buyer cheat himself ad libitum, but must not actively assist him in cheating himself." 1 Parsons on Contracts (9th Ed.) page 615.

The International had bought all the stock of the Osborne Company, and it had been transferred to a trustee for it, and there was, in the fact that the Osborne Company might better collect its bills receivable, no basis to justify the International in making a contract under which the Osborne Company could continue to advertise falsely that it was an independent concern, when it had in fact been merged with the International. It is safe to say that from January, 1903, the competition of the Osborne Company was in name only and did not exist in fact.

What has been said of the Osborne purchase is true in principle of purchases made by the International of the Keystone Company, the Minnie Harvester Company, and the Aultman-Miller plant.

Prior to the consolidation the first five companies were in fierce competition for trade, and especially was this true of the McCormick and the Deering Companies, and this competition extended, not only to price, but to the granting of expert assistance and numerous free items with machines. The result of the combination was that all this competition at once wholly ceased, except within the limitation of agents' commissions.

The defendants claim that the objects of the organization were:

First, to build up the foreign trade;

Second, by the combination to secure more capital to enable them to continue the battle in the foreign market;

Third, by enlarging the scope of the business so as to include other lines of agricultural implements to make an all the year around business;

—and that it was not the intention to oppress the domestic market, and that they have not done so.

It does appear that since the combination the foreign trade has been greatly increased. This trade of all the combining companies was

$10,400,000 in 1902, and has grown under the defendants' management to $50,000,000 in 1912. This vast growth is to the credit of the energy and enterprise of the defendants. But the growth of the trade of the companies who formed the combination was at the time of the consolidation very recent, and the trade was rapidly increasing just prior to the combination. With the knowledge that the foreign trade was making such a remarkable growth at the time of the consolidation, whether the separate companies would have increased their business as much as the defendants have done is a mere matter of speculation, on which we can venture no opinion.

It is claimed that the consolidation brought $60,000,000 of available cash to the new company with which to expand the foreign trade. This is not true. The government claims that not more than $10,000,000 of new cash was furnished, but in no event did it exceed $20,000,000. Forty million dollars of this so-called working capital was furnished in bills receivable of the old companies, just as available to the old companies as to the new; and $60,000,000 was issued for the tangible property of the old companies and the expenses of J. P. Morgan & Co. in connection with the organization of the new company, and for the Milwaukee Company.

Soon the International began buying and constructing plants to extend its business from the prior one of the manufacture of harvesting machinery to the manufacture of all of the five classes of agricultural implements heretofore referred to. Consequently a distinction is drawn in argument between what are called the old lines and the new.

It is contended by the government that the International used its prior monopoly of the old lines to impose its new lines upon dealers and it includes this among numerous charges of oppression upon purchasers.

While the evidence shows some instances of attempted oppression of the American trade by the International and the America Companies, such cases are sporadic, and in general their treatment of their smaller competitors has been fair and just, and if the International and America Companies were not in themselves unlawful there is nothing in the history of the expanding of the lines of manufacture, so as to make an all the year around business, that could be condemned.

[1] The real question is whether the combination of the companies was illegal in the beginning, or became so with the additions subsequently made.

This court is clearly of the opinion that the process by which it was made to appear that the properties were sold to Lane was merely colorable.

Parts of sections 1 and 2 of the Sherman Law are as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part

of the trade or commerce among the several states, **or with foreign nations,** shall be deemed guilty of a misdemeanor."

The question is whether the combination was illegal under this statute.

This statute must be construed in the light of reason. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, at page 180, 31 Sup. Ct. 632, 648 (55 L. Ed. 663).

In the latter case the Supreme Court said:

"Coming then to apply to the case before us the act as interpreted in the Standard Oil and previous cases, all the difficulties suggested by the mere form in which the assailed transactions are clothed become of no moment. This follows because although it was held in the Standard Oil Case that, giving to the statute a reasonable construction, the words. 'restraint of trade' did not embrace all those normal and usual contracts essential to individual freedom and the right to make which were necessary in order that the course of trade might be free, yet, as a result of the reasonable construction which was affixed to the statute, it was pointed out that the generic designation of the first and second sections of the law, when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed. That is to say, it was held that in view of the general language of the statute, and the public policy which it manifested, there was no possibility of frustrating that policy by resorting to any disguise or subterfuge of form, since resort to reason rendered it impossible to escape by any indirection the prohibitions of the statute."

[2] No weight is attached therefore to the means by which the combination was formed if a combination within the purview of the statute was created. That it was a combination of five companies is clear. The fact that this combination took the form of a new corporation is immaterial. United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663; United States v. E. I. Du Pont De Nemours & Co. (C. C.) 188 Fed. 127.

Was this combination in restraint of trade? It substantially suppressed all competition between the five companies, and the restraint of competition between combining companies is as illegal as destruction of competition between them without combining.

In United States v. E. I. Du Pont De Nemours & Co., 188 Fed. 127, in an able opinion by Lanning, Circuit Judge, in behalf of Circuit Judges Gray, Buffington, and himself, it is said:

"A number of bills were introduced in the Fiftieth Congress (in August and September, 1888), designed to make unlawful every combination 'to prevent competition' and 'to prevent full and free competition' in the sales of articles transported from one state to another. None of them was enacted into law. On December 4, 1889, Mr. Sherman introduced into the Senate of the Fifty-First Congress a bill which declared unlawful every combination 'to prevent full and free competition' in such sales. After much debate the bill was, on March 27, 1890, referred to the committee on judiciary, and on April 2, 1890, that committee reported it back to the Senate with an amendment, drawn by the late Senator Hoar, striking out all after its enacting clause and substituting therefor the act as we now have it. As enacted, it does not condemn every combination 'to prevent competition.' What it condemns is every combination in restraint of trade or commerce among the several states, etc.

When the bill went from the Senate to the House, the latter body amended it by inserting a provision extending the scope of the act to all agreements entered into for the purpose of 'preventing competition' either in the purchase or sale of commodities; but the amendment was disagreed to. While there is a 'general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body' (United States v. Freight Association, 166 U. S. 318, 17 Sup. Ct. 540, 41 L. Ed. 1007), that rule 'in the nature of things is not violated by resorting to debates as a means of ascertaining the environment at the time of the enactment of a particular law; that is, the history of the period when it was adopted' (Standard Oil Co. v. United States, 221 U. S. 50, 31 Sup. Ct. 512, 55 L. Ed. 619 [34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734], decided May 15, 1911).

"There is a distinction between restraint of competition and restraint of trade. The latter expression had, when the Anti-Trust Act was passed, a definite legal signification. Not every combination in restraint of competition was, in a legal sense, in restraint of trade. Two men in the same town engaged in the same business as competitors may unite in a copartnership, and thereafter, as between themselves, substitute co-operation for competition. Their combination restrains competition, and if their town is located near the line between two states, and each has been trading in both states, their combination restrains competition in interstate trade. But it does not necessarily follow that such restraint of competition is a restraint of interstate trade and commerce. The determination of whether it be so must depend upon the facts and circumstances of each individual case. It is undoubtedly the policy of the statute that competitive conditions in interstate trade should be maintained wherever their abolition would tend to suppress or diminish such trade. But this being true does not read into the statute a denunciation of all agreements that may restrain competition without regard to their purpose or direct effect to restrain 'trade or commerce among the several states.' To what extent the Anti-Trust Act condemns combinations that restrain full and free competition in interstate trade is a question that has been much debated. For a dozen years, at least, it has been settled that it does not condemn combinations which only indirectly, remotely, or incidentally restrain interstate trade.

"The recent decisions of the Supreme Court in Standard Oil Co. v. United States, and American Tobacco Co. v. United States, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, make it quite clear that the language of the Anti-Trust Act is not to receive that literal construction which will impair rather than enhance freedom of interstate commerce. As we read those decisions, restraint of interstate trade and restraint of competition in interstate trade are not interchangeable expressions. There may be, under the Anti-Trust Act, restraint of competition that does not amount to restraint of interstate trade, just as before the passage of the act there might have been restraint of competition that did not amount to a common-law restraint of trade. This fact was plainly recognized in United States v. Joint Traffic Association, 171 U. S. 505, 567, 19 Sup. Ct. 25, 31, 43 L. Ed. 259, where Mr. Justice Peckham said:

" 'We might say that the formation of corporations for business or manufacturing purposes has never, to our knowledge, been regarded in the nature of a contract in restraint of trade or commerce. The same may be said of the contract of partnership. It might also be difficult to show that the appointment by two or more producers of the same person to sell their goods on commission was a matter in any degree in restraint of trade. We are not aware that it has ever been claimed that a lease or purchase by a farmer, a manufacturer, or merchant of an additional farm, manufactory, or shop, or the withdrawal from business of any farmer, merchant, or manufacturer, restrained commerce or trade within the legal definition of that term.'

"While all this is true, the recent decisions of the Supreme Court make it equally clear that a combination cannot escape the condemnation of the Anti-Trust Act merely by the form it assumes or by the dress it wears. It matters not whether the combination be 'in the form of a trust or otherwise,' whether it be in the form of a trade association or a corporation, if it arbitrarily uses

its power to force weaker competitors out of business, or to coerce them into a sale to or union with the combination, it puts a restraint upon interstate commerce, and monopolizes or attempts to monopolize a part of that commerce, in a sense that violates the Anti-Trust Act."

In United States v. E. C. Knight Co., 156 U. S. 1, 16, 15 Sup. Ct. 249, 255 (39 L. Ed. 325), Chief Justice Fuller said:

"Again, all the authorities agree that in order to vitiate a contract or combination it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition."

And this was reiterated in Addyston Pipe Co. v. United States, 175 U. S. 211, 237, 20 Sup. Ct. 96, 44 L. Ed. 136.

In Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 454 (48 L. Ed. 679), it is said:

"We will not incumber this opinion by extended extracts from the former opinions of this court. It is sufficient to say that from the decisions in the above cases certain propositions are plainly deducible and embrace the present case. Those propositions are: * * * That railroad carriers engaged in interstate or international trade or commerce are embraced by the act; that combinations, even among *private* manufacturers or dealers, whereby *interstate or international commerce* is restrained, are equally embraced by the act; that Congress has the power to establish *rules* by which *interstate and international* commerce shall be governed, and, by the Anti-Trust Act, has prescribed the rule of free competition among those engaged in such commerce."

In United States v. Reading Co., 226 U. S. 324, 370, 33 Sup. Ct. 90, 103 (57 L. Ed. 243), it is said:

"Whether a particular act, contract, or agreement was a reasonable and normal method in furtherance of trade and commerce may, in doubtful cases, turn upon the intent to be inferred from the extent of the control thereby secured over the commerce affected, as well as by the method which was used. Of course, if the necessary result is materially to restrain trade between the states, the intent with which the thing was done is of no consequence. But when there is only a probability, the intent to produce the consequences may become important. United States v. St. Louis Terminal Association, 224 U. S. 383, 394 [32 Sup. Ct. 507, 56 L. Ed. 810]; Swift & Co. v. United States, 196 U. S. 375 [25 Sup. Ct. 276, 49 L. Ed. 518].

"In the instant case the extent of the control over the limited supply of anthracite coal by means of the great proportion theretofore owned or controlled by the defendant companies, and the extent of the control acquired over the independent output which constituted the only competing supply, affords evidence of an intent to suppress that competition, and of a purpose to unduly restrain the freedom of production, transportation, and sale of the article at tide-water markets.

"The case falls well within, not only the Standard Oil and Tobacco Cases, [221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663], but is of such an unreasonable character as to be within the authority of a long line of cases decided by this court. Among them we may cite: Northern Securities Co. v. United States, 193 U. S. 197 [24 Sup. Ct. 436, 48 L. Ed. 679]; Swift & Co. v. United States, 196 U. S. 375 [25 Sup. Ct. 276, 49 L. Ed. 518]; National Cotton Oil Co. v. Texas, 197 U. S. 115 [25 Sup. Ct. 379, 49 L. Ed. 689]; United States v. St. Louis Terminal Association, 224 U. S. 383 [32 Sup. Ct. 507, 56 L. Ed. 810]; and the recent case of United States v. Union Pacific Railway, 226 U. S. 61 [33 Sup. Ct. 53, 57 L. Ed. 124]."

In United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 648 (55 L. Ed. 663), it is said:

"Applying the rule of reason to the construction of the statute, it was held in the Standard Oil Case that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-Trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect, or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance. It was therefore pointed out that the statute did not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose. In other words, it was held, not that acts which the statute prohibited could be removed from the control of its prohibitions by a finding that they were reasonable, but that the duty to interpret, which inevitably arose from the general character of the term 'restraint of trade' required that the words 'restraint of trade' should be given a meaning which would not destroy the individual right to contract and render difficult, if not impossible, any movement of trade in the channels of interstate commerce—the free movement of which it was the purpose of the statute to protect. The soundness of the rule that the statute should receive a reasonable construction, after further mature deliberation, we see no reason to doubt. Indeed, the necessity for not departing in this case from the standard of the rule of reason which is universal in its application is so plainly required in order to give effect to the remedial purposes which the act under consideration contemplates, and to prevent that act from destroying all liberty of contract and all substantial right to trade, and thus causing the act to be at war with itself by annihilating the fundamental right of freedom to trade, which, on the very face of the act, it was enacted to preserve, is illustrated by the record before us. In truth, the plain demonstration which this record gives of the injury which would arise from and the promotion of the wrongs which the statute was intended to guard against, which would result from giving to the statute a narrow, unreasoning, and unheard of construction, as illustrated by the record before us, if possible, serves to strengthen our conviction as to the correctness of the rule of construction, the rule of reason, which was applied in the Standard Oil Case, the application of which rule to the statute we now, in the most unequivocal terms, re-express and reaffirm."

In Nash v. United States, 229 U. S. 373, 376, 33 Sup. Ct. 780, 781 (57 L. Ed. 1232), referring to the Standard Oil and American Tobacco Co. Cases, it is said:

"Those cases may be taken to have established that only such contracts and combinations are within the act as, by reason of intent *or the inherent nature of the contemplated acts*, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

In United States v. Freight Association, 166 U. S. 290, 339, 17 Sup. Ct. 540, 558 (41 L. Ed. 1007), the court said:

"The claim that the company has the right to charge reasonable rates, and that, therefore, it has the right to enter into a combination with competing roads to maintain such rates, cannot be admitted. The conclusion does not follow from an admission of the premise. What one company may do in the way of charging reasonable rates is radically different from entering into an agreement with other and competing roads to keep up the rates to that point. If there be any competition, the extent of the charge for the service will be seriously affected by that fact. Competition will itself bring charges down to what may be reasonable, while in the case of an agreement

to keep prices up, competition is allowed no play; it is shut out, and the rate is practically fixed by the companies themselves by virtue of the agreement, so long as they abide by it."

In Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865, the Supreme Court held a certain lease valid so far as the mere power to execute it was concerned, but that it became invalid when it tended directly and in a substantial manner to suppress competition under the common law, the Sherman Anti-Trust Law and the laws of Oklahoma. The decision was upon the sole ground of the undue suppression of competition.

[3] Suppression of competition, where the parties to a combination control a large portion of the interstate or foreign commerce in the article, and where there is no obligation to form the combination arising out of the fact that the parties to the same are losing money, or the like, has been held an undue restraint of trade. See Continental Wall Paper Co. v. Voight & Sons Co., 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486; Id., 148 Fed. 939, 78 C. C. A. 567, 19 L. R. A. (N. S.) 143; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Addyston Pipe Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; United States v. Addyston Pipe Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122; Chattanooga Foundry v. Atlanta, 203 U. S. 390, 27 Sup. Ct. 65, 51 L. Ed. 241; City of Atlanta v. Chattanooga Foundry, 127 Fed. 23, 61 C. C. A. 387, 64 L. R. A. 721; Montague v. Lowrey, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608.

In the United States v. Standard Oil Co. (C. C.) 173 Fed. 177, 184, Sanborn, Circuit Judge, in behalf of himself, Van Devanter, then Circuit Judge, now a Justice of the Supreme Court, and Adams, Circuit Judge, said:

"The purpose of this statute was to keep the rates of transportation and the prices of articles in interstate and international commerce open to free competition. Any contract or combination of two or more parties, whereby the control of such rates or prices is taken from separate competitors in that trade and vested in a person or an association of persons, necessarily restricts competition and restrains that commerce. * * * Agreements of competitive manufacturers and traders not to compete in the purchase or sale of articles in interstate commerce, or to buy or to sell them at prices fixed by a mutual agent or association, * * * are alike declared to be illegal by this law. In the construction and enforcement of this statute, corporations are persons, they are legal entities distinct from their stockholders, and the combination of two or more of them in restraint of trade is as unlawful as the combination of individuals."

In United States v. Addyston Pipe Co., 85 Fed. 271, 282, 29 C. C. A. 141, 151 (46 L. R. A. 122), Taft, Circuit Judge, speaking for Circuit Justice Harlan, the writer of the opinion, and Lurton, Circuit Judge, late a Justice of the Supreme Court, in an opinion exhaustive in its review of foreign and state decisions, quotes with approval from the opinion of Chief Justice Tindal in Horner v. Graves, 7 Bing. 735, the following:

"We do not see how a better test can be applied to the question whether this is or not a reasonable restraint of trade than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the

interests of the public. Whatever restraint is larger than the necessary protection of the party requires can be of no benefit to either. It can only be oppressive. It is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void on the ground of public policy."

In the United States v. American Tobacco Co. (C. C.) 164 Fed. 700, 702, 703, in an opinion by Lacombe, Circuit Judge, on behalf of himself and Coxe and Noyes, Circuit Judges, it is said:

"What benefits may have come from this combination, or from the others complained of, it is not material to inquire, nor need subsequent business methods be considered, nor the effects on production or prices. The record in this case does not indicate that there has been any increase in the price of tobacco products to the consumer. There is an absence of persuasive evidence that by unfair competition or improper practices independent dealers have been dragooned into giving up their individual enterprises and selling out to the principal defendant. * * *

"During the existence of the American Tobacco Company new enterprises have been started, some with small capital, in competition with it, and have thriven. The price of leaf tobacco—the raw material—except for one brief period of abnormal conditions, has steadily increased, until it has nearly doubled, while at the same time 150,000 additional acres have been devoted to tobacco crops and the consumption of the leaf has greatly increased. Through the enterprise of defendant and at large expense new markets for American tobacco have been opened or developed in India, China, and elsewhere. But all this is immaterial. Each one of these purchases of existing concerns, complained of in the petition, was a contract and combination in restraint of a competition existing when it was entered into, and that is sufficient to bring it within the ban of this drastic statute."

In State v. International Harvester Co., 237 Mo. 369, 394, 141 S. W. 672, 677, the court said:

"In the case at bar we are to take the acts of the parties and judge their purpose by the consequence that would naturally result. When men deliberately and intelligently go to work and acquire power that will enable them to control the market, if they choose to exercise it, there is no use for them to say that they did not intend to control the trade or limit competition, nor when the legality of their act of acquisition is in question is it any use for them to say, 'We have not used the power to oppress any one.'"

[4] We think it may be laid down as a general rule that if companies could not make a legal contract as to prices or as to collateral services they could not legally unite, and as the companies named did in effect unite the sole question is as to whether they would have agreed on prices and what collateral services they could render, when their companies were all prosperous and they jointly controlled 80 to 85 per cent. of the business in that line in the United States. We think they could not have made such an agreement. Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486; Id., 148 Fed. 939, 78 C. C. A. 567, 19 L. R. A. (N. S.) 143; Addyston Pipe Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518.

If the five companies which formed the International had been small, and their combination had been essential to enable them to compete with large corporations in the same line, then their uniting would, in the light of reason, not have been in restraint of trade, but in the furtherance of it; but when they constituted the largest manufacturers of

their articles in America, if not in the world, and held jointly about 80 to 85 per cent. of the trade, and two at least of the companies forming the combination were prosperous, their combining was, when similarly viewed, an unreasonable restraint of trade. If the business of the separate companies combining was unsuccessful, it could be claimed that their combination was reasonable, in view of the rule of reason as proclaimed by the Supreme Court; but it is conceded that the McCormick and the Deering Companies "had established reasonably successful and prosperous businesses," so that question is eliminated.

There is no limit under the American law to which a business may not independently grow, and even a combination of two or more businesses, if it does not unreasonably restrain trade, is not illegal; but it is the combination which unreasonably restrains trade that is illegal, and if the parties in controversy have 80 or 85 per cent. of the American business, and by the combination of the companies all competition is eliminated between the constituent parts of the combination, then it is in restraint of trade within the meaning of the statute, under all of the decisions.

The International is not only a great manufacturing company, but by the America Company is a great dealer in agricultural implements in interstate and foreign commerce, and so the case comes more nearly within the ruling in Addyston Pipe Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, than United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325.

It seems proper to call attention to the fact that all commerce is classified as intrastate, interstate, or foreign; both the first and second sections of the Sherman Law treat interstate and foreign commerce as separate and distinct entities. Foreign commerce is as distinct from interstate commerce as interstate commerce is distinct from intrastate commerce. Each is a unit. While intrastate commerce is within the control of the states, interstate and foreign commerce are both within the control of the United States, but as separate entities or units. The Congress has condemned any combination in restraint of either the foreign or the interstate trade, and if the International Harvester Company was in restraint of either the interstate or foreign trade it was unlawful. It would not be lawful to restrain the interstate trade in order to build up the foreign trade. The International, by suppressing all competition between the five original companies, was in restraint of trade as prohibited in the first section of the Sherman Law, and it tended to monopolize within the meaning of the second section of the same law, and this restraint and this monopoly were the direct and immediate effect of the consolidation, and were not incidental and uncertain in their effect.

In Standard Sanitary Manufacturing Co. v. United States of America, 226 U. S. 20, 49, 33 Sup. Ct. 9, 15 (57 L. Ed. 107), the court said:

"The Sherman Law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained.

"This court has had occasion in a number of cases to declare its principle. Two of those cases we have cited. The others it is not necessary to review or to quote from except to say that in the very latest of them the comprehensive and thorough character of the law is demonstrated and its sufficiency to pre-

vent evasions of its policy 'by resort to any disguise or subterfuge of form.' or the escape of its prohibitions 'by any indirection.' United States v. American Tobacco Co., 221 U. S. 106, 181 [31 Sup. Ct. 632, 649 (55 L. Ed. 663)]. Nor can they be evaded by good motives. The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of parties, and it may be of some good results. United States v Trans-Missouri Freight Ass'n, 166 U. S. 290 [17 Sup. Ct. 540, 41 L. Ed. 1007]; Armour Packing Co. v. United States, 209 U. S. 56, 62 [28 Sup. Ct. 428, 52 L. Ed. 681]."

We conclude that the International Harvester Company was from the beginning in violation of the first and second sections of the Sherman Law, and that this condition was accentuated by the reorganization of the America Company and by the subsequent acquisitions of competing plants, and that all the defendant subsidiary companies became from time to time parties to the illegal combination, and the defendant companies are combined to monopolize a part of the interstate and foreign trade. It will therefore be ordered that the entire combination and monopoly be dissolved, that the defendants have 90 days in which to report to the court a plan for the dissolution of the entire unlawful business into at least three substantially equal, separate, distinct, and independent corporations, with wholly separate owners and stockholders, or in the event this case is appealed, and this decree superseded, then within 90 days from the filing of the procedendo or mandate from the Supreme Court the defendants shall file such plan, and in case the defendants fail to file such plan within the time limit the court will entertain an application for the appointment of a receiver for all the properties of the corporate defendants, and jurisdiction is retained to make such additional decrees as may become necessary to secure the final winding up and dissolution of the combination and monopoly complained of, and as to costs.

HOOK, Circuit Judge (concurring). I concur in the foregoing opinion. The International Harvester Company is not the result of the normal growth of the fair enterprise of an individual, a partnership or a corporation. On the contrary, it was created by combining five great competing companies which controlled more than 80 per cent. of the trade in necessary farm implements, and it still maintains a substantial dominance. That is the controlling fact; all else is detail. No one who has studied with an open mind the history of the Sherman Act and the atmosphere in which it was framed can reasonably doubt that it was not born of a mere concern over prices in dollars and cents, but that it was also directed at the creation of artificial barriers across the avenues of industry, deemed destructive of the opportunity, initiative and independence of those who come after, and therefore against the common good. And the remedy prescribed was prohibition. It may be, as is said, that there is a growing recognition of the need of great concentrated resources for trade and commerce, even though secured by combination of independent, competing concerns. But that is not the Sherman Act. And a statute must be taken by the courts as a true estimate of that preponderance of public opinion which calls for legislative expression. It is not for them to question whether that

opinion was rightly weighed or interpreted, whether it is wise or unwise or whether it has since changed. The intent of a statute at its passage must continue. It does not automatically adjust itself to the variations of the public pulse, and a judicial adjustment would be an usurpation. In our national government such things are for Congress alone.

It is but just, however, to say and to make it plain that in the main the business conduct of the company towards its competitors and the public has been honorable, clean, and fair. Some petty dishonesties were tracked in at the start, mostly by subordinates who had been in the service of the old companies, but they were soon gotten rid of. In this connection it should also be said that specific charges of misconduct were made in the government's petition, which found no warrant whatever in the proof. They were of such a character and there was so much of them, apparently without foundation, that the case is exceptional in that particular.

SANBORN, Circuit Judge (dissenting). It is the opinion of the majority of the court that the property and the foreign and interstate business of the International Company must be divided into at least three substantially equal and independent parts, or placed in the hands of a receiver under a decree of this court, because in 1902 five companies theretofore engaged in the manufacture and sale of harvesting machinery, controlling about 85 per cent. of the interstate and foreign trade therein, combined in the International Company, ceased and have not since resumed competition among themselves. With profound respect for their judgment, I find myself forced to dissent from it: (1) Because it seems to me to give insufficient consideration to the trade conduct of the defendants at the time this suit was commenced in April, 1912, and for seven years before that date; (2) because the crucial issue in this case is not whether or not in 1902 or 1903 the defendants or their predecessors, by reason of the suppression of competition between five or more companies, made a combination or an attempted monopoly in restraint of trade, but it is whether or not ten years afterwards, in 1912, when the complaint in this suit was filed, the International Company and the other defendants were then unduly or unreasonably restraining or monopolizing interstate or foreign trade, or threatening so to do; and (3) because the evidence in this case has forced upon my mind the deep and abiding conviction that, for at least seven years before the commencement of this suit, the defendants had not been, and then were not, either so doing or threatening so to do.

1. Conceding, but not admitting, that if the combination of 1902 and 1903 had been challenged in 1903 or 1904, before the actual effect of the conduct of its business by the defendants upon interstate and foreign trade had been demonstrated by the actual trial of it from 1905 to 1912, a court might have presumed that the defendants were violating the Anti-Trust Law, and have so found on the theory that those who have power to violate a law are presumed to do so, yet the demonstration by actual trial, which the evidence seems to me to present, that at the time this suit was commenced the defendants were, and for

at least seven years before that time had been, conducting the business of the International Company and their business without unduly restraining or monopolizing interstate or foreign trade ought to, and in my opinion must, far outweigh that questionable presumption.    I say questionable presumption, because while it was invoked to sustain the view of the majority of the Supreme Court in that case in which they declared that the prohibition of the Anti-Trust Law was not limited to restraints of and attempts to monopolize interstate and foreign trade that were deleterious to the public and unreasonable, but embraced every direct restraint, whether beneficial or injurious to the public, and whether reasonable or unreasonable (Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679; Harriman v. Northern Securities Co., 197 U. S. 244, 291, 25 Sup. Ct. 493, 49 L. Ed. 739), and while it has been since cited in some cases, doubtless in deference to its citation in that case, it flies in the face of the basic principle of civil government and the indispensable and indisputable rule of law and of action that all persons are presumed to obey the laws and to discharge their legal and moral duties until the contrary is proved (Cole v. German Savings & Loan Society, 124 Fed. 113, 119, 59 C. C. A. 593, 63 L. R. A. 416; American Bridge Co. v. Seeds, 144 Fed. 605, 609, 75 C. G. A. 407, 11 L. R. A. [N. S.] 1041), and it is contrary to the universal experience of mankind, for persons who acquire the power to violate laws, whether against murder, or arson, or larceny, or undue restraints of trade, or unreasonable monopolies, or other forbidden acts, generally obey those laws and fail to exercise their power to violate them.    This alleged presumption never seemed well founded or reasonable to me, and now that the rule of reason must be applied to the interpretation of the Anti-Trust Law and to its application to the facts of each particular case, as well as to other laws and to the facts of other cases (Standard Oil Co. v. United States, 221 U. S. 1, 64, 67, 68, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 55 L. Ed. 663), I think this alleged presumption should be deemed functus officio.

2. The controlling issue in this case is not what combination or monopoly was made in 1902, 1903, or 1904, nor whether or not that combination was violative of the Anti-Trust Law.    It is:    Were the defendants in 1912 doing or threatening to do acts which so unreasonably restrained or monopolized interstate or foreign trade that it is the duty of this court of equity to enjoin and prevent their future performance? Sections 1 and 2 of the Anti-Trust Law forbid combinations and monopolies in undue restraint of interstate or foreign trade, and prescribe punishment by fine or imprisonment, or both, for any violation thereof; and section 725 of the Revised Statutes (U. S. Comp. St. 1901, p. 583) bars any prosecution under these acts for such violations three years after they are committed.    26 Stat. 209, c. 647, §§ 1, 2, and 4; Rev. St. § 1044 (U. S. Comp. St. 1901, p. 725); 3 Comp. St. 3200 and 3201; 1 Comp. St. 725, § 1044.    If, therefore, a combination or monopoly, in unreasonable restraint of trade, was made in

1902, 1903, or 1904, the proceedings to punish for the making thereof were barred many years before this suit was commenced.

Section 4 of the act gives jurisdiction to this court "to prevent and restrain violations of this act," but it grants this court no power to punish past violations thereof. This suit is not a proceeding to punish the defendants for deeds done in the past. It is a suit in equity under section 4 to prevent and restrain future violations of the Anti-Trust Law. It looks to the future, not to the past, and this court is not only without jurisdiction to punish defendants for past violations of this law, but persons who at some past time combined to unreasonably restrain or monopolize interstate or international trade were not thereby deprived of their right thereafter and now to conduct such trade in obedience to the law. New York, New Haven & Hartford R. R. Co. v. Interstate Commerce Comm., 200 U. S. 361, 404, 26 Sup. Ct. 272, 50 L. Ed. 515; United States v. Standard Oil Co. (C. C.) 173 Fed. 177, 190, 191. This suit, therefore, is nothing more than an appeal to the consciences of the members of this court of equity to prevent and enjoin future violations of this law by the defendants, and under familiar principles of equity jurisprudence no such restraint, injunction, or other relief may be lawfully granted here, unless the particular facts proved in this individual case clearly show that the defendants were violating or threatening to violate this Anti-Trust Act when this suit was commenced.

3. The particular facts proved in this individual case not only fail to show that the defendants were unduly or unreasonably restraining or attempting to monopolize interstate or foreign trade, or threatening so to do at the time this suit was commenced and for seven years before that time, but they establish the converse.

That the Anti-Trust Law is but the embodiment and application to interstate and foreign trade of the ancient English rule of public policy against undue and unreasonable restraints of trade and unreasonable monopolies, that it does not forbid all restraints upon such trade or all attempts to monopolize it, nor all restrictions of competition therein, but those only which are unreasonably injurious to the public, that the reason for and the purpose of the Anti-Trust Act are the same as the reason for and the purpose of that English rule of public policy, that the test and standard by which to determine whether or not the defendants in any case are unreasonably restraining or monopolizing interstate or foreign trade is the same which had been applied under the English rule of public policy for years before this Anti-Trust Act was enacted, and that, as Chief Justice White said, "the statute under this view evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference that is an undue restraint," are now rules of interpretation and application of this law conclusively established by the repeated decisions of the highest judicial tribunal in the land. Standard Oil Co. v. United States, 221 U. S. 1, 60, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A.

(N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 55 L. Ed. 663. Trade is the making and enforcing of contracts. And it necessarily follows, from the rule laid down in the excerpt just quoted from the opinion of the Chief Justice, that the Anti-Trust Act evidenced the intent not to restrain, and that it does not restrain, the trade or business of the defendants, "whether resulting from combination or otherwise," unless that trade or business is conducted by methods which constitute an interference which is an undue restraint of interstate or foreign commerce.

It is equally well established that the reason for the prohibition by the English rule of public policy and by the statute under consideration of unreasonable restraints of and attempts to monopolize trade was and is that, by unduly restricting competition, they are injurious to the public in that (1) they raise the prices to the consumers of the articles they affect, (2) limit their production, (3) deteriorate their quality, and (4) decrease the wages of the labor and the prices of the materials required to produce them. Standard Oil Co. v. United States, 221 U. S. 1, 52, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. Undue injury in the ways just stated to the public (that is to say, to the consumers and makers of the articles produced or sold) is the basis and reason for the prohibition and the test of undue or unreasonable restraint or attempt to monopolize. And if in any individual case the weight of the evidence fails to prove that the defendants' conduct of their business is so restricting or threatening to restrict competition in the articles they make or sell as to unduly injure the public by (1) raising the prices of the articles to the consumers, or (2) limiting their production, or (3) deteriorating their quality, or (4) decreasing the prices paid for the labor or materials required to produce them, or (5) by unfair and oppressive treatment of competitors, neither undue nor unreasonable restraint of competition, nor of trade, nor undue attempt to monopolize is established. The reason for the rule and for the prohibition in the law does not exist, and the law is inapplicable. "Cessante ratione, cessat ipsa lex." Green v. Liter, 8 Cranch, 229, 249, 3 L. Ed. 545. Such a case the evidence in this case seems to me to present.

Counsel for the government recognize the fact that it was essential to the grant of the relief they sought that they should plead and prove that, at the commencement of this suit, the defendants were committing, and threatening to commit, the acts constituting undue restriction of competition, undue restraint of trade, and undue attempt to monopolize trade which have been recited, and they alleged that they were committing them in their complaint. The main charge in their pleading was that the defendants between 1903 and April 30, 1912, had, by means of the International Company, unduly restricted competition in the manufacture and sale of harvesting machinery, drawn to itself the business therein, excluded other manufacturers and dealers therefrom, and that they threatened to continue so to do. The evidence, however, seems to me to have established the following facts, which in my judgment prove the contrary:

The amount of the domestic sales of the old lines claimed to have been monopolized (that is to say, of the harvesting machinery) by the five companies whose business was acquired by the International Company in 1902 was $46,142,158.64 in that year. The amount of the domestic sales of like machinery by the International Company in 1903 was $37,763,858.55, a decrease of 18.16 per cent.; in 1904 it was $32,337,917.32, a decrease in the two years of 29.92 per cent.; in 1905 it was $30,999,632.59, a decrease in the three years of 32.82 per cent.; and in 1912 it was only $39,062,455.36, which was 15.34 per cent. less than the amount of the domestic sales of the combining companies in 1902.

The average yearly acreage and production of small grain in the United States during the ten years prior to 1913 was greater than during the nine years prior to 1903. But the yearly average domestic sales of the International Company of all agricultural machinery, including both the old lines charged to have been monopolized and the new lines, such as harrows and cultivators, during the ten years prior to 1913, was $46,810,067, which was more than a million dollars less than the domestic sales of the vendor companies in 1902.

In 1903 the International Company sold 98.15 per cent. of the binders sold in the United States; in 1912 only 85.04 per cent. thereof. In 1903 the International Company sold 92.05 per cent. of all the mowers sold in the United States; in 1912 only 72.98 per cent. thereof. In 1903 the International Company sold 84.91 per cent. of the rakes sold in the United States; in 1911 it sold 67.79 per cent. thereof.

The average number of binders sold in the United States yearly by the five combining companies during the five years prior to 1902 was 152,364; the average number sold yearly by the International Company during the first ten years of its existence was 91,465.

In 1903 the International Company had five competitors, who in that year sold in the United States 1,960 binders, while in 1912 these competitors sold 15,631 binders and three new competitors sold 3,979. In 1903 eight competitors of the International Company sold in the United States 17,985 mowers, and in 1912 these and six other competitors sold 60,816. In 1903 ten competitors of the International Company sold in the United States 27,753 rakes, and in 1911 these and five other competitors sold 42,723, while the International Company sold 157,160 in 1903 and only 89,912 in 1912. In 1901 and 1902, in the section of Nebraska south of the Platte river, the combining companies sold substantially all the binders, but in 1912 the evidence tends to show that their competitors sold about one-half the binders sold in that country.

During all of the ten years prior to 1913, the International Company has had active and successful competitors in the manufacture and sale of harvesting machines, and during those years new competitors have established themselves in the business and become successful. Among its competitors in the manufacture and sale of harvesting machinery are the Acme Company, which entered the field in 1907 or 1908, which makes harvesting machinery only, which conducts a growing and successful business, and which sold in the United

States 11,400 harvesting machines in 1908 for $779,672 and 31,000 harvesting machines in 1912 for $2,100,000; Deering & Co. with an issued capital stock of over $50,000,000, which sold 490 mowers in 1906 and 7,314 in 1911; the Johnston Harvester Company with an issued capital stock of $1,800,000 whose sales of binders increased from 1,002 in 1903 to 3,027 in 1911, whose sales of mowers increased from 2,527 in 1903 to 7,026 in 1911, whose sales of corn binders increased from 528 in 1903 to 3,150 in 1911, and whose sales of rakes increased from 1,855 in 1903 to 5,200 in 1911; the Independent Harvester Company, which entered the field with the manufacture of 954 mowers and 135 binders in 1910 and increased its output to about 2,700 mowers and about 1,900 binders in 1912; the Wood Mowing & Reaping Company and several others, while the J. I. Case Threshing Machine Company, with an issued capital stock of $20,000,000, was constructing, when this suit was commenced, a large plant to manufacture a binder to be sold in competition with those of the International Company. The foregoing facts portray the course of the business in the old lines. In the new lines scores of companies and tens of millions of dollars of capital were and are engaged in active and successful competition with the International Harvester Company. The facts which have been recited, and other facts and circumstances to the same effect, seem to me to establish the conclusion that, during the ten years of the operation of the International Harvester Company, neither it nor the defendants were, nor are they, drawing to it its competitors' share of the interstate trade in harvesting machinery, or excluding them therefrom, and that, on the other hand, the International Company's proportion of this trade has been decreasing and that of its competitors increasing.

Counsel for the government charged that the defendants bought factories and failed to operate them in order to restrain and monopolize the trade, but the proof was that they operated every factory they purchased. And the purchase of factories and the organization and operation of subsidiary companies to produce or prepare the raw materials needed for the manufacture of their machines, or to manufacture new lines of implements, was a just and lawful method of conducting their business and tended not to restrain but to promote trade and competition.

If competition is desirable, the entry of a new competitor into any line of manufacture or trade is ordinarily lawful and must be generally beneficial.

The government charged that the defendants systematically bought up patents on and inventions of harvesting machinery in order to make or perpetuate a monopoly in the trade in it. But the proof was that the defendants have no patents upon any parts of any of their harvesting machines, and that any manufacturer is free to make and sell any or all parts of them in competition with them.

Counsel for the government alleged that the defendants reduced the prices of its machines in certain localities in order to drive competitors out of the trade, and increased their prices in other localities to make up the loss, and that it committed many oppressive and un-

just acts to restrict competition and monopolize trade. Volumes of evidence were taken regarding these averments. The conduct of the business of the defendants for years in all parts of the land were searched and proved. Among the innumerable acts of the defendants and their agents in conducting their vast business for a decade, the government found some that were unfair to competitors, but they were either unauthorized acts of subordinate agents or sporadic and exceptional instances. The weight of the evidence of the officers and agents of their competitors who came in large numbers to testify, and of all the witnesses upon the subject, is so overwhelming that the general conduct and the almost universal practice of the defendants and their agents was and is free from all methods and acts either unlawful, unfair, or oppressive towards their competitors, that it has left no doubt that the consistent and persistent purpose, policy, rule of action, and practice of the defendants has been and is to avoid and prevent all acts and methods unfair, unjust, or oppressive towards their competitors, to leave competition with them free, to give to them full and fair opportunities to secure shares of the trade and business in which they are all engaged, and to carry on their own trade honestly, justly, and fairly.

During the ten years from 1902 to 1912 there was a general and substantial rise in the prices of machinery and commodities of nearly all kinds in the United States. Harvesting machines were improved and made more durable and efficient. But their prices to the consumers remained nearly stationary, and increased far less than the prices of other agricultural machinery the trade in which was not claimed to have been restrained or monopolized. The chief harvesting machine was the binder. Its price advanced about 5 per cent. during some of the intermediate years, but was substantially the same in 1912 for a better machine that it was for a poorer machine in 1902, while the prices of cultivators, wagons, and plow goods, which were certainly not monopolized, advanced from 10 to 30 per cent.

The government charged that the defendants monopolized the trade in binder twine and increased its price to the consumers, but the proof was that in 1912 the inmates of two state's prisons and fourteen other competitors were selling binder twine; that one of them, the Plymouth Cordage Company, sold 100,000,000 pounds of it in that year, while the International Company sold only 112,000,000 pounds in the United States and 22,000,000 pounds in Canada; and that the price of binder twine decreased from 11 cents a pound in 1902 to $7\frac{1}{4}$ cents a pound in 1912. Meanwhile the cost of the raw material required to make harvesting machines advanced and the wages of the labor required to construct them increased from 20 to 30 per cent.

So it is that the evidence has convinced me that at least for seven years before this suit was commenced, and at that time, the defendants were neither unduly restricting competition in the manufacture or sale of the machinery and articles in which they were dealing or drawing to themselves an undue share of the business therein, or excluding other manufacturers and dealers therefrom, or practicing acts unjust or unfair to, or oppressive of, their competitors, or threatening

so to do; that they were not injuring the public by raising the prices to the consumers of the articles in which they dealt, or limiting the production thereof, or deteriorating their quality, or decreasing the wages of the laborers employed to make them, or the prices paid for the materials required to construct them, or threatening so to do; but that they were doing the opposite of these things. And the acts of the defendants and the proved effect of their acts during at least seven years before this suit was commenced, to my mind, demonstrate the fact that they were neither unduly nor unreasonably restraining or attempting to monopolize interstate or foreign trade in the articles they made and sold, and that they and their case fall far without the prohibition of the Anti-Trust Law and the reason for it.

4. The only reason for the prevention or restraint of acts of defendants in a suit under the fourth section of the statute is, as we have seen, that they are or threaten to be unduly injurious to the public. If they are not thus injurious, or if they are beneficial, and such restraint or prevention of their acts would be injurious to the public, they should not be restrained or prevented. The defendants claim that the main purpose of the combination of 1902 and 1903 was to develop the foreign trade in American harvesting machines; that that development could not be successfully made without a much larger capital than any of the combining companies possessed; and that the cessation of competition among the combining companies was merely incidental to the acquisition of the capital requisite to accomplish that purpose. The facts in this case are so clear that the purpose and intent of the defendants are not material. The prevention or restriction of their acts by the decree of a court of equity is always a matter within the sound judicial discretion of the chancellor or chancellors composing the court, and, while in exercising this discretion the rules of law and the facts already stated seem to me to be decisive, the following are not altogether unworthy of consideration. The proof is that during the ten years preceding 1913 the International Company at great expense taught the people of foreign countries the use of American harvesting machinery, and developed the foreign trade therein in such a way that, while in 1902 the sales in foreign trade of machines, repairs, and twine by the companies whose business was acquired by the International Company amounted to about $10,400,000, the sales of the International Company in the foreign trade gradually increased until in 1912 they amounted to $50,896,000, and so that, while in 1903 the domestic sales of that company were 76.5 per cent., and its sales in the foreign trade were 23.5 per cent., of its total sales, in 1912 its domestic sales were 55.7 per cent., and its sales in the foreign trade 44.3 per cent., of its total sales. The employment of the necessary American laborers and salesmen at the increasing wages the defendants have paid and are paying to make and to sell in other lands these machines and the purchase at the increasing prices paid of the materials to construct this vast volume of machinery unavoidably tends to increase the wages of the laborers and the prices of the materials, and hence to benefit the public, and any receivership or subdivision of the property and the business of

these defendants cannot fail to tend to cripple and diminish this business, to restrain the advance, or to decrease the wages of the laborers and the prices of the materials required to carry it on, and thereby to inflict injury upon the public.

Again, the combination denounced and the International Company, in which it was embodied, have been in existence, and that company and the other defendants had been conducting their business, for almost ten years before this suit was commenced. If the making of that combination was originally a violation of the Anti-Trust Act, the prosecution of the defendants at law under sections 1 and 2 of the Anti-Trust Act for that violation was barred many years before this suit was commenced. It is a general rule of equity jurisprudence that the courts of chancery will apply the doctrine of laches in analogy to the limitation of like actions at law. Conceding that this rule does not control this suit because mere delay does not bar a sovereignty from sustaining a suit in equity to maintain and enforce its equitable rights, nevertheless, when a sovereignty submits itself to a court of equity and prays its aid, its claims and rights are, and ought to be, judicable by the general principles and rules of equity applicable to the claims and rights of private parties under like circumstances. State of Iowa v. Carr, 191 Fed. 257, 266, 112 C. C. A. 477, and cases there cited. It is a maxim of equity jurisprudence that, as Lord Camden said in Smith v. Clay, 3 Brown's Chancery, 639: "Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence." The business of the International Company gradually increased during nearly ten years after the formation of the combination assailed until that business reached the vast volume indicated at the time this suit was commenced. Its business was conducted openly without legal challenge or attack, so far as this record shows, during all these years, and it is not improbable that many parties hold stock of the International Company which they purchased during these ten years in reliance upon these facts, the value of which a decree against the defendants will greatly depreciate. So it is that in any event this suit does not appeal to the conscience of a chancellor with the force it might have had in 1903 or 1904 before the actual conduct of the business of the defendants had demonstrated its innocuous effect and no parties had been induced to act in reliance upon its freedom from attack.

5. The evidence in this suit seems to me to present a new case under the Anti-Trust Law. No case has been found in the books, and none has come under my observation, in which the absence of all the evils against which that law was directed at the time the suit was brought, and for seven years before, was so conclusively proved as in this suit, the absence of unfair or oppressive treatment of competitors, of unjust or oppressive methods of competition, the absence of the drawing of an undue share of the business away from competitors and to the defendants, the absence of the raising of prices of the articles affected to their consumers, the absence of the limiting of the product, the absence of the deterioration of the quali-

ty, the absence of the decrease of the wages of the laborers and of the prices of the materials, the absence, in short, of all the elements of undue injury to the public and undue restraint of trade, together with the presence of free competition which increased the share of the competitors in the interstate trade and decreased the share of the defendants. Neither the Standard Oil Co. Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, nor the American Tobacco Co. Case, 221 U. S. 106, 108, 31 Sup. Ct. 632, 55 L. Ed. 663, nor any other authority cited, seems to me to rule this case, because in none of them was there such affirmative and, to my mind, conclusive evidence that for years before the suits were commenced the defendants had practiced no acts and pursued no methods which constituted an undue restraint of trade or an unreasonable attempt to monopolize it.

And because in this suit this court is without power to punish past violations of the Anti-Trust Law, and the limit of its jurisdiction is to prevent and enjoin future acts violative thereof, because the making of the combination of 1902 and 1903, whether violative of the Anti-Trust Law or not, did not deprive the defendants of their right thereafter and now to conduct their business in obedience to that law, because the question in this case is not whether or not the combination of 1902 and 1903 was violative of that law, but it is whether or not in April, 1912, when this suit was commenced, the defendants were unduly or unreasonably restraining or attempting to monopolize interstate or foreign trade, because it was not the effect of the Anti-Trust Law, nor was it the intent of the Congress which passed it, to prohibit all restriction of competition or all restraints of interstate or foreign trade, or all attempts to monopolize parts of it, but only those restraints and attempts to monopolize which are unduly injurious to the public by (1) raising the prices to the consumers of the articles they affect, (2) limiting their production, (3) deteriorating their quality, (4) decreasing the wages of the laborers and the prices of the materials required to produce them, or (5) practicing unfair and oppressive treatment of competitors, because the evidence has convinced me that for at least seven years before this suit was commenced, and at that time, the defendants were not injuring the public by unduly or unreasonably restricting competition in the manufacture or sale of the machinery or articles which they were making and selling, or by drawing to themselves an undue share of the business therein, or by excluding other manufacturers or dealers therefrom, or by practicing acts unjust or unfair to, or oppressive of, their competitors, that they were not injuring the public by raising the prices to the consumers of the articles they made or sold, or limiting their production, or deteriorating their quality, or decreasing the wages of the laborers employed to make them, or the prices paid for the materials required to construct them, that they were not threatening to do these things, but they were doing the opposite of these things to the substantial benefit of their competitors, of the consumers of their products, of the laborers who make them, the men who furnish the material for

them, and the public in general, because the acts of the defendants during these seven years do not constitute that undue or unreasonable restraint of or attempt to monopolize interstate or foreign trade forbidden by the Anti-Trust Act, and because, in my opinion, the prevention or restraint of these acts or this business of the defendants, or the splitting of their business and property into three or more independent parts, or the seizure of it by a receiver, by virtue of a decree of a court of equity, would not tend to prevent undue restraint of, or undue attempts to monopolize, interstate or foreign trade, but, on the other hand, would tend to produce or foster the very evils at which the Anti-Trust Act was leveled, to wit, the restriction or lessening of competition, the increase of the prices of the machinery and articles affected, the deterioration of their quality, the limitation or reduction of the product and the diminution of the wages of the laborers making them and of the prices of the materials required to produce them to the substantial injury of the public, I am unable to concur in the opinion or the decree against the defendants in this case. In my opinion, a decree should be rendered that the complaint in this suit be dismissed without prejudice to the right of the United States to bring another suit of like character against any of the defendants whenever any of them is found to be engaged in the commission of any acts in violation of the anti-trust statute.